UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

AMY C. TAIT &                                    *
CHRISTOPHER L. STRECKER,                          *
Co-Personal Representatives of the Estate of      *
MICHAEL T. STRECKER,                              *
                                                  *    Civil Action Docket No.
            Plaintiffs                            *
                                                  *
v.                                                *
                                                  *
LAKE REGION                                       *
SCHOOL DISCTICT (M.S.A.D. # 61),                  *
ALAN SMITH, and                                   *
JESSICA DAGGETT (AKA "JESSICA K.                  *
DIBIASE"),                                        *
                                                  *
            Defendants.

## PLAINTIFFS' COMPLAINT
## AND DEMAND FOR JURY TRIAL

NOW COME Plaintiffs, Amy C. Tait and Christopher L. Strecker, as Co-Personal

Representatives of the Estate of Michael T. Strecker, by and through counsel, and discharge their

Complaint against Defendants as follows:

## INTRODUCTION AND
## STATEMENT OF CLAIMS

This is a civil rights action arising out of the wrongful death of Michael T. Strecker

occurring on September 12, 2021, during a school-sponsored senior class trip (*hereinafter* the

"'Senior Awareness' Trip") on South Baldface Mountain in the White Mountain National Forest

located in/around North Chatham, New Hampshire.

The deceased's biological parents, Plaintiffs Amy C. Tait and Christopher L. Strecker—

individually and as Co-Personal Representatives of the Estate of Michael T. Strecker—bring this

action pursuant to 42 U.S.C. § 1983, seeking to vindicate the rights of Michael T. Strecker as

1

guaranteed by the Fourteenth Amendment of the United States Constitution and deprived by Defendants.

Specifically, Michael T. Strecker was just 17 years old when he died of exertional heat stroke while in the custody of Defendants M.S.A.D. #61 and—in their official capacity as employees thereof—Defendants Jessica K. Daggett (AKA "Jessica K. DiBiase") and Superintendent Alan Smith.

Michael T. Strecker's death was proximately caused by Defendant M.S.A.D. #61's direct implementation and/or execution of policies, policy statements, regulations, practices, customs, and/or final decisions that visited an unconstitutional deprivation of civil rights upon Michael T. Strecker, including the right to due process, under the Constitution of the United States.

Plaintiffs base all applicable and appropriate claims as to Defendant M.S.A.D. #61 on the doctrines of municipal liability pursuant to *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978), and detailed *infra*.

Plaintiffs base all applicable and appropriate claims as to Defendants Jessica K. Daggett and Superintendent Alan Smith on two tracks of liability. First, Plaintiffs allege damages arising out of the bad acts of Defendants Daggett and Smith in their respective, official capacities as employees and/or officers of Defendant M.S.A.D. #61. Like the claims against Defendant M.S.A.D. #61, the claims against Defendants Daggett and Smith in their official capacities are predicated upon the doctrines of municipal liability pursuant to *Monell*, 436 U.S. 658 (1978). *See Brandon v. Holt*, 469 U.S. 464, 471-72 (1985); *Kentucky v. Graham*, 473 U.S. 159 (1985).

Separately, Plaintiffs allege damages arising out of the bad acts of Defendants Daggett and Smith in their respective, personal capacities for actions taken under color of state law giving rise

to the deprivation of civil rights upon Michael T. Strecker, including the right to due process, under the Constitution of the United States, and *Kentucky*, *infra*, 473 U.S. 159.

Plaintiffs have served notice of the Estate's state law claims in compliance with 14 M.R.S. § 741.

## JURISDICTION

1.      This Court has original jurisdiction over the instant action because this action arises under federal law (28 U.S.C. § 1331) and seeks redress for the deprivation of Decedent's constitutional rights by Defendants acting under color of State law (28 U.S.C. § 1343(a)(3)).

2.      Pursuant to 28 U.S.C. § 1367(a), this Court possesses supplemental jurisdiction over pendant state law claims under Maine law as applied to Jessica K. Daggett and Superintendent Alan Smith in their individual capacities.

## VENUE

3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) where all defendants are residents of the State of Maine.

4.      Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) where a substantial part of the events and omissions giving rise to the claim occurred within this judicial district and because the Defendants are therein subject to *in personam* jurisdiction.

## PARTIES

5.      Plaintiff Amy C. Tait (*hereinafter* "Plaintiff Tait") is a resident of Casco, County of Cumberland, State of Maine. She is an adult female.

6.      Plaintiff Christopher L. Strecker (*hereinafter* "Plaintiff Strecker") is a resident of Chester, County of Windsor, State of Vermont. He is an adult male.

7.     Decedent Michael Thomas Strecker (DOB: 06/10/2004; *hereinafter* "Decedent") was a resident of Casco, County of Cumberland, State of Maine, at the time of his death on September 12, 2021. He was a male minor child.

8.     Plaintiff Tait is Decedent's biological mother.

9.     Plaintiff Strecker is Decedent's biological father.

10.    Plaintiffs Tait and Strecker were appointed Co-Personal Representatives of Decedent's estate on November 23, 2021.

11.    On information and belief, all defendants are Maine municipal entities and/or individual members thereof by and through their status as employees of Lake Region School District.

12.    Defendant Lake Region School District (*a/k/a and hereinafter* "M.S.A.D. #61") is a governmental entity which, at all times pertinent to this Complaint, employed Superintendent Alan Smith (*hereinafter* "Defendant Smith") and humanities teacher Jessica K. Daggett (AKA "Jessica K. DiBiase" and *hereinafter* "Defendant Daggett"), and was responsible for hiring, training, supervising, and disciplining employees, faculty, and staff in M.S.A.D. #61, including Defendant Daggett.

13.    Defendant Smith, being Superintendent of the Lake Region School District, is Defendant M.S.A.D. #61's chief executive officer and "final decision-maker."

14.    At all times pertinent to this Complaint, Defendant Daggett was a resident of Harrison, County of Cumberland, State of Maine, and has been employed as a teacher by M.S.A.D. #61 at Lake Region High School in Naples, County of Cumberland, State of Maine, since 2011.

15.    At all times pertinent to this Complaint, Defendant Smith was, on information and belief, a resident of the County of Androscoggin, State of Maine, and has been employed as

Superintendent of Schools by M.S.A.D. #61 in Bridgton, County of Cumberland, State of Maine, since 2014.

16.     Defendants Daggett and Smith were, at all times relevant to this Complaint, working as licensed Maine educators acting within the scope and course of their official duties (official capacity; *Monell*) and under color of state law (personal capacity; *Graham*).

## FACTS

### *M.S.A.D. #61 Policy, Custom, Final Decision, and Failure to Train, Supervise, or Equip Resulting in Due Process Violations Shocking to the Conscience*

17.     On/about September 12, 2021, Decedent was a student enrolled at Lake Region High School in Naples, Maine.

18.     Lake Region High School is a public school under the administration of Defendant M.S.A.D. #61 and Defendant Superintendent Alan Smith.

19.     On September 12, 2021, Decedent was aged 17 years, three months, and three days and was a member of the graduating Senior Class of 2022 at Lake Region High School.

20.     In the weeks prior to September 12, 2021, Defendant M.S.A.D. #61 sanctioned, approved, and/or facilitated organization of the annual "Senior Awareness" Trip.

21.     The "Senior Awareness" Trip is a school-sponsored event during which members of the graduating class go on an overnight trip together with staff, faculty, and/or chaperones selected and approved by Defendant M.S.A.D. #61 and Defendant Superintendent Smith.

22.     On information and belief, Defendant M.S.A.D. #61 had sponsored, endorsed, planned, and/or supervised the "Senior Awareness" Trip for approximately 18 to 20 years prior to the September 12, 2021, trip.

23.     Prior to the "Senior Awareness" Trip of September 12, 2021, Defendant M.S.A.D. #61 circulated a document entitled "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk." *See* document attached herewith as "Exhibit A."

24.     On information and belief, Defendant M.S.A.D. #61's "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk" was adopted on/around April 1, 2019. *Id.*

25.     On information and belief, Defendant M.S.A.D. #61's "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk" specified that the "Senior Awareness" Trip was scheduled to take place from Sunday, September 12, 2021, to Monday, September 13, 2021. *Id.*

26.     On information and belief, Defendant M.S.A.D. #61's "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk" stated that the "Senior Awareness" Trip would consist of "hiking and camping in the White Mountain National Forest, and beach time" at the "So. Baldface Mt. and Cold River Campground, N. Chatham, NH; Fryeburg beach." *Id.*

27.     On information and belief, Defendant M.S.A.D. #61's "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk" stated as "Associated Risks" the "possibility of hiking falls" and "cold weather." *Id.*

28.     On information and belief, Defendant M.S.A.D. #61's "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk" stated as "Safety Measures" the availability of "first aid kits on site, multiple chaperones and experienced hikers." *Id.*

29.     On information and belief, prior to September 12, 2021, Decedent and other members of Decedent's graduating class met with chaperones for the upcoming "Senior Awareness" Trip on several occasions during school hours at Lake Region High School.

30.     On information and belief, at these meetings students were informed by employees and/or agents of Defendant M.S.A.D. #61 that students would be permitted to stop hiking and "go back" at any point during the approximately 11-hour planned hike.

31.     On information and belief, at these meetings students inquired whether they should wear "hiking boots" or other specialized footwear and were informed by employees and/or agents of Defendant M.S.A.D. #61 that sneakers would be "just fine" to wear during the hike.

32.     On information and belief, at these meetings students were informed by employees and/or agents of Defendant M.S.A.D. #61 that chaperones on the hike would be expertly trained in emergency medical aid (including cardiopulmonary resuscitation, or "CPR") and had expert training and/or experience in mountain hiking.

33.     On information and belief, at these meetings students were informed by employees and/or agents of Defendant M.S.A.D. #61 that there would not be cellular phone service on-site at/around the destination.

34.     On information and belief, at these meetings students were informed by employees and/or agents of Defendant M.S.A.D. #61 that chaperones on the "Senior Awareness" Trip would be equipped with personal radios to communicate between groups of students/chaperones on the trail.

35.     On information and belief, at these meetings students were informed by employees and/or agents of Defendant M.S.A.D. #61 that potable water would be furnished by Defendant M.S.A.D. #61.

36.     On information and belief, additionally, at these meetings students were advised by employees and/or agents of Defendant M.S.A.D. #61 to bring a minimum of one quart of water for personal consumption.

37.     On information and belief, Defendants M.S.A.D. #61, Daggett, and/or Smith, acting in their official capacities, never communicated to students attending the "Senior Awareness" Trip, or their parents, that Defendant M.S.A.D. #61 possessed automatic electronic defibrillators ("AEDs"), but would not be bringing said AEDs on the "Senior Awareness" Trip.

38.     On information and belief, Defendants M.S.A.D. #61, Daggett, and/or Smith, acting in their official capacities, never communicated to students attending the "Senior Awareness" Trip, or their parents, that Defendant M.S.A.D. #61—by and through its chief executive and final decision-maker, Defendant Smith—was unaware that there would be no cellular service at the destination and during the duration of the "Senior Awareness" Trip.

39.     On information and belief, Defendants M.S.A.D. #61, Daggett, and/or Smith, acting in their official capacities, never communicated to students attending the "Senior Awareness" Trip, or their parents, that Defendant M.S.A.D. #61—by and through its employees and/or agents, including Defendants Daggett and Smith, in their official capacities—would not conduct a pre-boarding equipment and safety check of students.

40.     On information and belief, students were required to furnish a cooler bearing their name and "site number" several days before the "Senior Awareness" Trip.

41.     On information and belief, chaperones employed by Defendants M.S.A.D. #61were permitted to conduct bag/equipment checks, as was communicated to students on the "Items to Bring" Form. It is not yet apparent whether Defendants M.S.A.D. #61 complied with this practice.

42.     On information and belief, Defendants M.S.A.D. #61, Daggett, and/or Smith, acting in their official capacities, never communicated to students attending the "Senior Awareness" Trip, or their parents, that Defendant M.S.A.D. #61 knew or reasonably should have known that it lacked satellite communications devices capable of accessing outside emergency medical services from any location at the destination.

43.     On information and belief, none of the foregoing contained in paragraphs 30-42 of the instant Complaint was detailed, summarized, or included in Defendant M.S.A.D. #61's "FIELD TRIP/SCHOOL ACTIVITY Consent of Parent or Guardian & Acknowledgment of Risk" document.

44.     On information and belief, none of the foregoing contained in paragraphs 30-42 of the instant Complaint was detailed, summarized, or otherwise communicated by Defendant M.S.A.D. #61, in any format, to parents of students attending the "Senior Awareness" Trip.

45.     On information and belief, and following the fatal incident of September 12, 2021, Defendant Superintendent Smith held a closed-door meeting for students and parents of those students who had attended the "Senior Awareness" Trip on Wednesday, September 15, 2021, at 6:00 P.M.

46.     On information and belief, during this meeting (*hereinafter* "the Meeting"), Defendant Superintendent Smith laid bare the defective nature of Defendant M.S.A.D #61's policies and plan for the "Senior Awareness" Trip:

> A parent spoke to me about, uh, notification of how difficult this trip was—uh, this hike was. And that, that parent that spoke to me about it had no idea how difficult this was. Uh, and, so I checked—and again—uh, this is a trip that's been going on for almost 20 years, I guess. Long before I got here. And sometimes when those types of things happen I, I think we as individuals—I know me as an individual—just assume that things are great, and they go well and there's never been a problem. So, sometimes we don't ask enough

9

questions. I know I didn't. Um, but it is true—from what I can gather—that the kids do have two or three meetings and really are explained as to how difficult the trip is. Now, explaining to someone how challenging it can be versus whatever it actually is not always the same thing, but it also was expressed to me that they're not involving the parents as to really clarifying what this is all about, how it works. I mean, I've— I've learned so much myself over the last few days as to different parts of the, the hike—what takes place here, what takes place there—uh, how they're working to try to create bonding between the kids. I get that, um but certainly that information needs to be shared with parents and of of any trip—not just this trip. So, we're also learning from that front. We're will be revamping our trip uh form. There's a two-page form that has to be filled out, and last night we had a couple of uh, uh trips requested— and obviously this form had not been changed at that point—and its very clear that around some of the emergency procedures and some of the processes that are asked for they're not detailed enough. And we need to ask more finite questions and ask about 'is this there,' 'is that there,' which we are doing, and the, and the trip form will be changed to help in that area. So, so uh I can't think of anything else right off the top of my head.

*Statements of Superintendent Alan Smith*, Senior Awareness Trip Incident Meeting (Sep. 15, 2021).

47.    On information and belief, at this same Meeting, Defendant Smith was asked what medically-trained personnel, if any, were in attendance on the "Senior Awareness" Trip. In response, Defendant Smith averred:

> We did have five people there. All five of those people uh were uh certified in CPR and three of them were certified in first aid safety training, and they did have some basic medical pieces.

*Id.*

48.    On information and belief, at this same Meeting, Defendant Smith was asked whether any of these chaperones had advanced life support ("ALS") training to which Defendant Smith replied that "all staff have CPR training." *Id.*

49.     On information and belief, at this same Meeting, Defendant Smith was asked whether and what type of first-aid kits were available to students and chaperones on the "Senior Awareness" Trip. In response, Defendant Smith stated:

> Uh, I don't totally—I wouldn't want to answer that question based on self—saying something I don't know.

*Id.*

50.     On information and belief, at this same Meeting, Defendant Smith was asked where each of the chaperones was physically stationed/located amongst the line of students as they hiked up the mountain. In response, Defendant Smith stated:

> They were—they were throughout the entire group of kids. And the, and the way this trips works, uh, some kids are faster than other kids—I guess is they way they put it—but then they have different places from what I understand where they stop and wait for other kids. So it's, it's a process. And again, there were five people. I can't tell you who was where at any one time, but I can tell you that towards the end there were absolutely certified first aid people there.

*Id.*

51.     On information and belief, at this same Meeting, Defendant Smith was asked whether any of the chaperones present on the "Senior Awareness" Trip had any specialized or particularized training and/or experience hiking. In response, Defendant Smith stated:

> There were at least three on the trip who have done extensive hikes like this and, uh, uh bigger, bigger events than this and they were absolutely aware of and trained in that aspect. There were three people. I don't know if there were more than that though. Out of the trip that was taken there, most of the people I'd say, about two-thirds of the people had been 10 times.

*Id.*

52.     On information and belief, at this same Meeting, Defendant Smith was asked whether AED devices had been taken on the trip. In response, Defendant Smith averred: "We did

11

not. And that is absolutely something that will never happen again. . . . And also, we do have those portable AEDs… ." *Id.*

53.    On information and belief, at this same Meeting, Defendant Smith was asked why students had been informed that sneakers would be appropriate—or, "just fine"—footwear on this trip. In response Defendant Smith stated" "From that standpoint that's the first time I've heard that." *Id.*

54.    On information and belief, at this same Meeting, Defendant Smith was asked why Defendant M.S.A.D. #61 had prepared and executed such an unsafe policy/plan for the "Senior Awareness" Trip, to which Defendant Smith replied:

> This has been done for 18 to 20 years here. I, I apologize for not digging into it deeper. Uh, yeah, I, I, ya know, sometimes hindsight is always 20/20—I think—and in this case I have no idea either as to some parts and pieces of this.

*Id.*

55.    On information and belief, at this same Meeting, Defendant Smith was asked why Defendant M.S.A.D. #61 had not ensured that a satellite communications device was accessible to those on the "Senior Awareness" Trip in light of the known condition of spotty to no cellular service. In response, Defendant Smith averred:

> There's a piece that I, again, wish you know more than you did. I had ***no*** idea, and I've been here seven years, I had no idea that they did not have cell service. . . . I guess it was an assumption that, you know, I was, I was—I've never been told that—it's never been brought to my attention in all the time I've been here, and I assumed that with way the world is that there would be cell service.

*Id* (emphasis in original).

*The Incident*

56.     On September 12, 2021, at/around the period of time between 7:00am to 7:30 a.m., Decedent reported to Lake Region High School to board a school bus owned and operated by Defendant M.S.A.D. #61.

57.     On information and belief, at no time prior to, during, or after boarding the school bus did any of the Defendants conduct or cause to be conducted a routine "safety check" of students attending the "Senior Awareness" Trip to evaluate and determine whether each student was properly outfitted with the requisite safety gear to support what is generally regarded by the hiking and outdoor recreation community to be a grueling hike.[1]

58.     On information and belief, at no time prior to, during, or after boarding the school bus did any of the Defendants ensure that any/all chaperone(s) was outfitted with at least one functioning AED unit.

---

[1] The Baldface Circle Trail is popularly referred to as part of New Hampshire's "Terrifying 25"—a list of notoriously challenging trails shared by the hiking and outdoors recreation community. *See* https://www.newenglandwaterfalls.com/terrifying25.php -:~:text=The%20Terrifying%2025%20is%20one%20of%20several%20extremely,scree%20slopes%2C%20boulder%20caves%2C%20ladders%20and%20rock%20slides.



*A badge affiliated with the "Terrifying 25" hiking and outdoor recreation community.*

59.     On information and belief, at no time prior to, during, or after boarding the school bus did any of the Defendants ensure that any/all chaperone(s) was outfitted with at least one functioning satellite communications device.

60.     On information and belief, the school bus carrying Decedent, his classmates, and staff, faculty, employees, agents, and/or chaperones of Defendant M.S.A.D. #61, including Defendant Daggett, departed at approximately 7:30 a.m.

61.     On information and belief, Decedent and other occupants of the school bus arrived at the Baldface Trailhead parking lot on Route 113 in Chatham, New Hampshire at/around 8:30 a.m.

62.     On information and belief, Decedent and other occupants of the school bus set off to begin hiking up the Bald Face Circle Trail at approximately 8:45 a.m.

63.     On information and belief, there were approximately 30 to 40 students in attendance on the "Senior Awareness" Trip—including Decedent—and approximately 6 to 8 adult chaperones, including Defendant Daggett (a ratio range of 5:1).

64.     On information and belief, Defendant Daggett—who had been designated as the "Sweeper" to walk with and assist the slowest students at the rear of the hiking party—began hiking with Decedent, who was proceeding up the trail at a slow pace, trailing the entire school hiking group.

65.     On information and belief, approximately 15 minutes into the hike, Decedent expressed that he was fatigued, unable to continue on the hike, and wanted to "go back," as had been promised to students during pre-trip meetings, *supra*.

66.     On information and belief, Defendant Daggett informed Decedent that he could not stop, and instead instructed Decedent to "push on" to a "shelter" that was located approximately halfway between the trailhead and the summit.

67.     On information and belief, some students observed that, at this time, at approximately 9:00 a.m., Decedent appeared pale and had blue-colored lips at the time he asked to "go back."

68.     On information and belief, at some point during Decedent's pleas to stop or "go back" Defendant Daggett responded by yelling at Decedent to "get the fuck up" the trail.

69.     On information and belief, these same students were sufficiently concerned by Decedent's appearance that they attempted to text their parents with concerns about the trip's safety.

70.     On information and belief, Decedent and Defendant Daggett stopped at a "shelter" located on the trail approximately 2.2 miles from the parking lot from which the group departed.

71.     On information and belief, Decedent consumed a turkey and cheese sandwich for lunch and was observed drinking fluids.

72.     On information and belief, following lunch, Decedent and the group returned to the trail where Decedent informed Defendant Daggett that Decedent was tired and again voiced his need to "go back." By this time, Decedent was again at the latter-most portion of the hiking procession.

73.     On information and belief, sometime after leaving the halfway "shelter" and reaching the base of the summit, Decedent stopped and vomited.

74.     On information and belief, sometime after leaving the halfway "shelter" and reaching the base of the summit Defendant Daggett lost sight of Decedent for approximately 30 minutes it, after which time Defendant Daggett saw Decedent and noted that "[h]e was moving."

75.     On information and belief, sometime after leaving the halfway "shelter" and reaching the base of the summit, students overheard Defendant Daggett telling the Decedent that the Decedent "may hate [Defendant Daggett] now, but you'll be glad later that I pushed you."

76.     On information and belief, at some point during the group's ascent, and during a break in hiking, Decedent and Defendant Daggett encountered an individual who was not affiliated with the "Senior Awareness" Trip. This individual—an experienced 39-year-old hiker named Steven Darnell—observed that Decedent looked unwell ("visibly out of it"), likely needed medical attention, and should not continue hiking.

77.     On information and belief, sometime after leaving the halfway "shelter" and reaching the base of the summit, students overheard Defendant Daggett boasting that the hike was a "race back to the campground" and making comments that if she—a woman in her 40s—could "do the hike, then so can [the students]."



*Photograph depicting Decedent (seated, leftmost) at approximately 2:12 pm on September 12, 2021, near the summit of Baldface Mountain.*

78.     On information and belief, after reaching the summit Defendant Daggett stopped with Decedent to take a "short break" with Decedent, who did not scale the summit.

79.     On information and belief, at several points during the hike—both up and down the trail—Decedent asked for water and was sometimes denied or rationed servings by Defendant Daggett.

80.     On information and belief, Decedent accompanied another unidentified chaperone and began proceeding back down the summit.

81.     On information and belief, Defendant Daggett again made contact with Decedent at approximately 3:00 p.m., as the hiking group continued to descend the mountain. At this time, Defendant Daggett observed Decedent moving slowly and drinking water.

82.     On information and belief, throughout the entirety of the hike, Defendant Daggett either denied or allowed no more than short, two-minute breaks.

83.     On information and belief, at approximately 4:30 p.m. Decedent collapsed and was unable to stand.

84.     On information and belief, at approximately 4:30 p.m., when Decedent fell, someone in the hiking group recognized that they "rear" group—in which Decedent was a member—was out of potable water, and sent students "down the trail" to retrieve more to give to Decedent.

85.     On information and belief, Defendant Daggett "radioed down" for help using "walkie talkies" and an unidentified student and unidentified chaperone began ascending the trail with water.

86.     On information and belief, approximately three chaperones and four to five students from "down the trail" ran back up towards Decedent and Defendant Daggett.

87.     On information and belief, an unidentified chaperone provided Decedent with trail-mix, chocolate, and water—which Decedent attempted to consume.

88.     On information and belief, Decedent was assisted to his feet, given two walking sticks belonging to Defendant Daggett, and instructed to resume hiking down the trail to the start point.

89.     On information and belief, Decedent was able to continue descending the trail for approximately 15 minutes before he stopped, unable to continue.

90.     On information and belief, someone from Decedent's group made radio contact with the larger group of students and chaperones who, having completed the hike, had gathered at a location called "Emerald Pool."

91.     On information and belief, a chaperone and teacher named Michael Finnerty of Poland, Maine, was located at Emerald Pool with the majority of students when he received a radio call requesting assistance with Decedent.

92.     On information and belief, Finnerty realized that he would be unable to assist Decedent in a timely manner and instead ran to his vehicle and drove to a location where he could access cellular service.

93.     On information and belief, Finnerty made contact with 911 dispatch at approximately 7:04 p.m.

94.     On information and belief, Finnerty then returned to the trail where he accompanied teachers Danielle Rowland, Tyler Oren, and Barry Johnson up the trail to Decedent's location with Defendant Daggett.

95.     On information and belief, Finnerty, Rowland, Oren, Johnson and several students made contact with Defendant Daggett and Decedent. They attempted to assist Decedent to his feet, and provide him with Gatorade, but Decedent had become agitated and his legs were too weak to stand.

96.     On information and belief, Rowland observed that Decedent would not eat or drink, but Rowland eventually cajoled Decedent into taking sips of water and eating a small piece of candy.

97.     On information and belief, Rowland observed that Decedent kept trying to sit up. In response, those present laid Decedent back down—with Oren on one side and an unidentified student on the other side of Decedent.

98.     On information and belief, Decedent then told Oren and the unidentified student that Decedent was cold. Oren gave Decedent layers of clothing and attempted to calm Decedent until first responders could arrive.

99.     On information and belief, Decedent then vomited and Oren and the unidentified student turned Decedent onto his side to keep him from aspirating the emesis.

100.    On information and belief, two unidentified chaperones began constructing a makeshift travois to transport Decedent off the trail after attempts to carry Decedent on the shoulders of various students and chaperones failed.

101.    On information and belief, Decedent's condition concurrently worsened. He became increasingly agitated, combative, and eventually nonresponsive.

102.    On information and belief, first responders from a local Fire Rescue unit were dispatched to the Baldface Trailhead parking lot. Upon arrival, first responders made their way to Decedent's last known location—approximately 1.2 miles up the Slippery Brook Trailhead.

103.    On information and belief, when first responders made contact with Decedent they observed that Decedent had shallow breathing and an inconsistent pulse. Decedent was observed as responding to some stimuli, but was uttering and moaning incoherently.

104.    On information and belief, Decedent stopped breathing at approximately 8:23 p.m., and CPR was initiated.

105.    On information and belief, first responders from the Carroll County Sheriff's Department devised a plan to retrieve Decedent and deliver an AED by way of a "side-by-side" vehicle deployed via the "old Forest Service tote road" that runs parallel to the Baldface Trail.

106.    On information and belief, first responders deployed the AED and performed a scan which advised continued CPR, but no shock intervention.

20

107.    On information and belief, first responders were unable to access Decedent by way of the "side-by-side" vehicle, and instead began to manually evacuate Decedent off the trail, stopping intermittently to administer CPR during their descent.

108.    On information and belief, following a third AED scan, medical personnel at Bridgton Hospital in Bridgton, Maine, issued orders for first responders to cease CPR.

109.    Decedent was pronounced dead at 9:03 p.m. on September 12, 2021.

110.    On information and belief, first responders were eventually able to reach the "side-by-side" and Decedent's body was driven back to the Baldface Trail parking lot where it was received by the New Hampshire State Medical Examiner's Office.

## GENERAL ALLEGATIONS

111.    While present and in attendance on the "Senior Awareness" Trip, Decedent was confined to the custody of Defendants M.S.A.D. #61, Daggett, and Smith on September 12, 2021.

112.    By and through Defendant Daggett's legal status as an employee of Defendant M.S.A.D. #61, Decedent was confined to the personal custody of Defendant Daggett during the "Senior Awareness" Trip on September 12, 2021.

113.    Pursuant to the Fourteenth Amendment of the United States Constitution, for all periods hereto material, Decedent had a substantive due process right to safety, freedom from unreasonable restraint, and care.

## COUNT I

*(Against Defendant M.S.A.D. # 61)*

42 U.S.C. § 1983 - *Monell – Municipal Acts in Deprivation of Due Process and Shocking to the Conscience: Official Policy*

114.    Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

115.     Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of an official policy deprives an individual of his rights protected under the Constitution. *Monell*, 436 U.S. at 694-95.

116.     To be cognizable, a substantive due process claim under 42 U.S.C. § 1983 must allege facts "so extreme and egregious as to shock the contemporary conscience." *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998)).

117.     Plaintiffs allegations contained in the preceding paragraphs contain factual averments of conduct so extreme and egregious as to shock the contemporary conscience.

118.     Municipal liability under *Monell* exists where a public school, as here, causes deprivation of constitutional rights incident to an officially promulgated or adopted policy.

119.     Defendant M.S.A.D. #61 adopted such a policy in violation of Decedent's constitutionally-protected rights, as *supra*.

120.     The official policy of condoned negligence is tacitly or overtly sanctioned, as evidenced by the conduct of Defendant M.S.A.D. #61's official "Senior Awareness" Trip policies amounting in a deliberate indifference to Decedent's constitutional rights.

121.     This unconstitutional behavior by Defendant M.S.A.D. #61 is carried out pursuant to an official policy, whether formal or informal, which violates the constitutional rights of persons situated such as Decedent.

122.     Defendant M.S.A.D. #61 failed to take sufficient remedial actions to end this official policy, pattern of practice, or custom.

## COUNT II

*(Against Defendant M.S.A.D. # 61)*

42 U.S.C. § 1983 - *Monell – Municipal Acts in Deprivation of Due Process and Shocking to the Conscience: Custom*

123.    Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

124.    Municipal liability under *Monell* exists where, as here, a public school adheres to an unwritten custom that is long standing and/or has the force of law and deprives a person of their constitutionally protected rights.

125.    Defendant M.S.A.D. #61 adhered to such an unwritten custom in violation of Decedent's constitutionally-protected rights, as *supra*.

126.    The unwritten custom of condoned negligence is tacitly or overtly sanctioned, as evidenced by the conduct of Defendant M.S.A.D. #61's long-standing customs pertaining to administering the "Senior Awareness" Trip amounting in a deliberate indifference to Decedent's constitutional rights.

127.    This unconstitutional behavior by Defendant M.S.A.D. #61 is carried out pursuant to these unwritten customs, whether formal or informal, violates the constitutional rights of persons situated such as Decedent.

128.    Defendant M.S.A.D. #61 failed to take sufficient remedial actions to end these unwritten customs.

## COUNT III

*(Against Defendant M.S.A.D. # 61)*

42 U.S.C. § 1983 - *Monell – Municipal Acts in Deprivation of Due Process and Shocking to the Conscience: Failure to Equip/Train*

129. Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

130. Municipal liability under *Monell* exists where, as here, a public school fails to properly train, supervise, and equip its employees amounting to a deliberate indifference to one's constitutional rights. *See City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985); *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

131. Defendant M.S.A.D. #61 so failed to properly train, supervise, and equip its employees amounting to a deliberate indifference to, and in violation of, Decedent's constitutionally-protected rights, as *supra*.

132. This unconstitutional behavior by Defendant M.S.A.D. #61 violates the constitutional rights of persons situated such as Decedent.

133. Defendant M.S.A.D. #61 failed to take sufficient remedial actions to rectify its failure to properly train, supervise, and equip its employees.

## COUNT IV

*(Against Defendant M.S.A.D. # 61)*

42 U.S.C. § 1983 - *Monell – Municipal Acts in Deprivation of Due Process and Shocking to the Conscience: Decision by Final Decisionmaker*

134. Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

135.    Municipal liability under *Monell* exists where, as here, deprivation of constitutional rights is incident to the decision of a final decision-maker like Defendant Smith.

136.    At all times relevant, Defendants M.S.A.D. #61 had a duty of care and custody to ensure no harm befell Decedent in violation of Decedent's constitutionally-guaranteed rights.

137.    Defendants M.S.A.D. #61 breached this duty through the final decisions of Defendant Smith.

138.    The unconstitutional behavior of M.S.A.D. #61 was carried out pursuant to the final decisions of Defendant Smith.

139.    Defendants M.S.A.D. #61 failed to take sufficient remedial actions to rectify the unconstitutional final decisions of Defendant Smith.

140.    The resulting failure was a proximate cause of the fatal injury suffered by Decedent.

## COUNT V

42 U.S.C. § 1983 – Failure to Protect in Violation of the Fourteenth Amendment of the United States Constitution ("State Created Danger")

*(Against Defendants M.S.A.D. # 61, Daggett and Smith, acting in official capacity)*

141.    Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs as though fully set forth herein.

142.    At all times hereto relevant, Defendants M.S.A.D. #61, Daggett, and Smith were acting under color of law.

143.    By and through their actions and omissions, Defendants M.S.A.D. #61, Daggett, and Smith unlawfully deprived Decedent of his life without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States by failing to provide protection from danger created or enhanced by their affirmative acts.

144.    Upon information and belief, M.S.A.D. #61, and its officers and agents—including Defendants Daggett and Smith—violated protocols and standards under the circumstances, creating and/or enhancing such danger to Decedent.

145.    Defendants' actions and deliberate indifference were so egregious and outrageous that they shock the contemporary conscience.

146.    Defendants' deprival of due process caused Decedent conscious pain and suffering and ultimately death.

147.    At all times hereto relevant, Defendant M.S.A.D. #61 and its officers, employees and agents—including Defendants Daggett and Smith—were charged with the custody, care, and protection of Decedent, a minor, and exercised control over Decedent to the exclusion of others. As such, at all times hereto relevant, Defendants M.S.A.D. #61, Daggett, and Smith each had a duty to protect and ensure the safety of Decedent at all pertinent times Decedent was entrusted to Defendants' custody and care while on the "Senior Awareness" Trip.

148.    Upon information and belief, and at all time relevant hereto, Defendants knew or reasonably should have known that the planned hike was challenging, lengthy, strenuous, and included difficult features such as slides and rock scrambles that may not have been appropriate for all students.

149.    On information and belief, and at all times relevant hereto, Defendants M.S.A.D. #61, Daggett, and Smith knew or reasonably should have known that appropriate and reasonable safety and emergency response measures available to chaperones and/or staff on the "Senior Awareness" Trip were either unreasonably deficient and/or inadequate, or entirely lacking.

150.    Defendants M.S.A.D. #61, Daggett, and Smith knew or reasonably should have known that the unreasonable deficiency and/or inadequacy—or entirely absent—safety and

emergency response measures available to chaperones and/or staff on the "Senior Awareness" Trip created an environment in which custodians of Decedent and other students entrusted to their care were unable to reasonably safeguard against, remediate, respond to and/or prevent the harm that befell Decedent in violation of Decedent's Fourteenth Amendment right to safety and care while entrusted to Defendants' respective custody.

151.   On information and belief, Defendants M.S.A.D. #61, Daggett, and Smith knew or reasonably should have known of the risks created by the unreasonably deficient and/or inadequate—or entirely absent—safety and emergency response measures available to chaperones and/or staff on the "Senior Awareness" Trip as demonstrated by other similar incidents ("OSIs") in which physical bodily harm—including fatalities—had befallen students, arising from a similar set of circumstances.

152.   On information and belief, Defendants M.S.A.D. #61, Daggett, and Smith knew or reasonably should have known that neither Daggett nor any other chaperones and/or staff on the "Senior Awareness" Trip had received training, were certified in, or were properly equipped to prevent, detect, remediate, and/or respond to a serious medical event like that experienced by Decedent.

153.   On information and belief, Defendants M.S.A.D. #61, Daggett, and Smith knew or reasonably should have known that each was, respectively, failing to fulfill their obligations to ensure that the minor children in their custody—including Decedent—were safe from reasonably predictable, detectable, and preventable harms such as befell Decedent.

154.   Upon information and belief, and at all times hereto relevant, Defendant Daggett was under instructions to chaperone those students who, for whatever reason, were moving at a slower pace and/or keep up with the majority of the students on the hike.

27

155.    Upon information and belief, Defendant Daggett's responsibility was to stay with the slower group of students and accommodate them—including stopping and taking breaks if and/or when necessary—and not to "push" or "coach" this slower group of students.

156.    Upon information and belief, Decedent was denied multiple requests to stop the hike and turn back, even as he began exhibiting increasing signs and symptoms of physical distress.

157.    Upon information and belief, before Decedent's death his condition deteriorated to the point that he appeared "visibly out of it," such that others had to carry his belongings for him, and that he required the physical assistance of students and multiple walking sticks to keep going before he eventually vomited and lost consciousness.

158.    Defendant Daggett purposefully and willfully ignored Decedent's verbal pleas for help as well as his visible signs of physical distress. When Decedent repeatedly begged Defendant Daggett to "stop" and/or to "turn back" because he was experiencing heat stroke, Defendant Daggett responded by callously harassing Decedent, telling him, *inter alia*, to "get the fuck up the mountain."

159.    Defendant Daggett's conduct was intentionally or recklessly done, was outrageous and extreme in that it exceeded all possible bounds of decency, and is conduct that a reasonable person would regard as atrocious and utterly intolerable in both the context of a school trip and, generally, in a civilized community.

160.    Defendants M.S.A.D. #61, Daggett, and Smith's ill preparedness and failure to ensure that students and chaperones were properly equipped for the circumstances of the hike, as well as any for any potentially foreseeable emergencies increased the danger to the Decedent and ultimately contributed to his untimely death.

161.     Defendant Daggett's conscious and willful decision act outside the bounds of her responsibility by refusing to allow Decedent to stop the hike and turn back, restricting Decedent's access to water, and by physically and verbally pushing Decedent onward during the course of the hike, despite his obviously worsening state, created a danger to Decedent's health that would not have otherwise existed, ultimately causing Decedent fatal injuries.

162.     Defendant Daggett's unlawful actions depriving Decedent of his constitutional rights were sufficiently clearly established such that Daggett should have understood what she was doing was unlawful.

163.     Defendant Daggett violated clearly established law that her actions were unconstitutional by affirmatively enhancing or creating a danger to Decedent and then by failing to ameliorate that danger.

164.     As a direct and proximate cause and result of the foregoing, Decedent suffered fatal personal injuries, including a prolonged period of agonizing pre-death conscious pain and suffering during which time Decedent was begging Defendant Daggett to stop and rest.

165.     At all times pertinent hereto, Decedent was in the exercise of reasonable due care.

## COUNT VI

*(Against Defendants M.S.A.D. # 61 Daggett and Smith, individually)*

State Law Claims – *Negligence*

166.     Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs.

167.     All of the individual Defendants named in this Complaint are directly or are employees, agents, and/or officers of M.S.A.D. #61.

168.   All acts of the individual Defendants alleged herein were conducted within the scope of the Defendants' employment or duties.

169.   Defendant M.S.A.D. #61 owed a duty of care to Decedent to exercise reasonable care in hiring, retaining, and supervising its employees.

170.   Defendant M.S.A.D. #61 knew or should reasonably have known of Defendant Daggett's and/or Defendant Smith's negligent, reckless, and/or dangerous character based on information reasonably available to it and of which it had or should reasonably have had actual knowledge.

171.   Defendant Smith is a superior supervisor to Defendant Daggett. Along with M.S.A.D. #61, Defendant Smith owed Decedent a duty of care to properly supervise Defendant Daggett.

172.   Defendants M.S.A.D. #61 and Smith breached their duty of care by not properly supervising Defendant Daggett in the incident with Decedent.

173.   Each of Defendants were under a duty of reasonable care not to cause harm to Decedent, under Maine law.

174.   Each of Defendants breached its duty of care through respective negligent acts, constituting, *inter alia*, negligent hiring, retention, supervision, and/or infliction of emotional distress.

175.   As a result of Defendants' negligent acts, Decedent reasonably feared for, and ultimately lost, his life and suffered severe pre-death emotional distress.

## COUNT VI

*(Against Defendant Daggett, individually)*

State Law Claim – *Intentional Infliction of Emotional Distress*

176.     Plaintiffs reallege and incorporate by reference all allegations set forth in the preceding paragraphs.

177.     At all times hereto relevant, Defendant Daggett was an employee of Defendant M.S.A.D. #61 and was, for the purposes of the "Senior Awareness" Trip, the staff person assigned by Defendant M.S.A.D. #61 to hike and "stay with" the slowest group of students on their ascent up the mountain.

178.     On information and belief, and at all times hereto relevant, Defendant Daggett was under instructions to chaperone those students who, for whatever reason, were moving at a slower pace and/or unable to partake in the hike while keeping with the majority of the students.

179.     On information and belief, Defendant Daggett's job was not to "push" or "coach" this slower group of students, rather Defendant Daggett had been instructed to stay with these students and accommodate them—including stopping and taking breaks if and/or when necessary.

180.     Defendant Daggett purposefully and willfully defied these instructions. When Decedent repeatedly begged Defendant Daggett to "stop" and/or to "turn back" because he was experiencing heat stroke, Defendant Daggett responded by callously harassing Decedent, telling him, *inter alia*, to "keep fucking going."

181.     Defendant Daggett's conduct was substantially certain to result in severe emotional distress upon Decedent.

182.     Defendant Daggett's conduct was intentionally or recklessly done, was outrageous and extreme in that it exceeded all possible bounds of decency, and is conduct that a reasonable

person would regard as atrocious and utterly intolerable in both the context of a school trip and, generally, in a civilized community.

183.    As a result of Defendant Daggett's conduct as described *supra*, Decedent suffered emotional distress so severe that no reasonable person could be expected to endure it.

184.    Defendant Daggett's intentional infliction of emotional distress was a direct and foreseeable cause of Decedent's damages.

## **CONCLUSION**

WHEREFORE, Plaintiffs Amy Tait and Christopher Strecker, as Co-Personal Representatives of the Estate of Michael T. Strecker, respectfully demand a trial by jury on all issues triable for damages in an amount proven therein, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

Respectfully submitted,

Dated:  August 25, 2023

Dated:  August 25, 2023

**/s/ Mark E. Dunlap**
Mark E. Dunlap, Esq.
Maine Bar No. 1120
Peter Thompson & Associates, LLC
43 U.S. Route 1
Falmouth, ME 04105
(207) 874-0909
Attorney for Plaintiff, Amy Tait
mdunlap@ptlawoffice.com

**/s/ Michael T. Bigos**
Michael T. Bigos, Esq.
Maine Bar No. 9607
Berman & Simmons, P.A.
P.O. Box 961
Lewiston, ME  04243-0961
(207) 784-3576
Attorney for Plaintiff, Christopher Strecker
bigosservice@bermansimmons.com

**/s/ Sebastian B. Okun**
Sebastian B. Okun, Esq.
Maine Bar No. 5237
Peter Thompson & Associates, LLC
43 U.S. Route 1
Falmouth, ME 04105
(207) 874-0909
Attorney for Plaintiff, Amy Tait
sokun@ptlawoffice.com

**/s/ Joseph G.E. Gousse**
Joseph G.E. Gousse, Esq.
Maine Bar No. 5601
Berman & Simmons, P.A.
P.O. Box 961
Lewiston, ME  04243-0961
(207) 784-3576
Attorney for Plaintiff, Christopher Strecker
bigosservice@bermansimmons.com

CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2023, I electronically filed the foregoing using the CM/ECF system, which will send electronic notifications of such filing to the following:

    Melissa A. Hewey, Esq.
    Drummond Woodsum
    84 Marginal Way, Ste. 600
    Portland, ME 04101-2480
    mhewey@dwmlaw.com


Dated:  August 25, 2023              Dated:  August 25, 2023

**/s/ Mark E. Dunlap**             **/s/ Michael T. Bigos**
Mark E. Dunlap, Esq.              Michael T. Bigos, Esq.


**/s/ Sebastian B. Okun**            **/s/ Joseph G.E. Gousse**
Sebastian B. Okun, Esq.             Joseph G.E. Gousse, Esq.