UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| AMY C. TAIT & <br> CHRISTOPHER L. STRECKER, <br> Co-Personal Representatives of the Estate of <br> MICHAEL T. STRECKER, <br><br> Plaintiffs <br><br> v. <br><br> LAKE REGION SCHOOL DISTRICT <br> (M.S.A.D. #61), ALAN SMITH, and <br> JESSICA DAGGETT (AKA "JESSICA K. <br> DIABIASE"), <br><br> Defendants. | Case No. 2:23-cv-00329-LEW |

### MOTION TO DISMISS OF DEFENDANTS LAKE REGION SCHOOL DISTRICT AND ALAN SMITH

Defendants Lake Region School District (M.S.A.D. #61) and Alan Smith (together, the "School Defendants") move this Court to dismiss Counts I through V of Plaintiffs' Complaint with prejudice pursuant to F.R. Civ. P. 12(b)(6) for failure to state a claim, and to decline to exercise jurisdiction over Counts VI and VII[1] and dismiss them without prejudice.

### INTRODUCTION

The facts of this case are tragic: As alleged in the Complaint, on September 12, 2021, Michael Strecker (referred to in the Complaint and herein as "Decedent"), a 17 year old student at the Lake Region High School, died of exertional heat stroke while on a senior class trip on South Baldface Mountain in the White Mountain National Forest in New Hampshire. Plaintiffs

---

[1] The Complaint contains seven counts, the last two of which – a claim against Daggett and Smith for negligence, and a claim against Daggett for intentional infliction of emotional distress – are both labeled "Count VI." This motion will refer to the IIED claim, the seventh, as "Count VII."

1

allege that the Decedent's death was caused by the failure of the School Defendants to have appropriate safety precautions in place and that co-Defendant Jessica Daggett required the Decedent to continue the hike after he exhibited signs of being unwell.  The claims, in which Plaintiffs repeatedly characterize the School Defendants' behavior as "condoned negligence," are, in essence, state-law tort claims and as this Court stated in *Berry v. RSU 13 School Board*: "As civil rights statutes are not intended to be a font of tort law, the Court grants a motion to dismiss a complaint that resonates in tort, not constitutional law."  No. 2:15-CV-00146-JAW, 2016 WL 742901, at *1 (D. Me. Feb. 24, 2016).  Plaintiffs' federal claims against the School Defendants should therefore be dismissed.

## FACTUAL BACKGROUND

The Complaint alleges the following facts, which the Court will accept as true on a motion to dismiss.

**A.   The Parties**

Defendant Lake Region School District ("MSAD 61") is a school district organized under the laws of Maine.  ECF Doc. 1, PageID # 4 (Compl. ¶ 12).  Defendant Alan Smith has been the superintendent of MSAD 61 since 2014.  ECF Doc. 1, PageID # 4 (Compl. ¶ 15).  Defendant Jessica Daggett has been a teacher employed by MSAD 61 since 2011. ECF Doc. 1, PageID # 4 (Compl. ¶ 14).

In September 2021, Michael T. Strecker ("Decedent") was a senior at Lake Region High School in MSAD 61.  ECF Doc. 1, PageID # 5 (Compl. ¶¶ 17, 19).  Plaintiffs are Decedent's parents and co-personal representatives of his estate.  ECF Doc. 1, PageID # 4 ( Compl. ¶¶ 8-9).

**B.   Background and Organization of the Senior Awareness Trip**

MSAD 61 sponsored an annual overnight trip (the "Senior Awareness Trip") for members of the graduating class of Lake Region High School, accompanied by staff, faculty, and chaperones

selected and approved by MSAD and Superintendent Smith. ECF Doc. 1, PageID # 5 (Compl. ¶¶ 20-21). MSAD 61 had sponsored, planned, or supervised the annual Senior Awareness Trip for about 20 years before 2021. ECF Doc. 1, PageID # 5, 9-10 (Compl. ¶¶ 22, 46).

Prior to the September 2021 Senior Awareness Trip, MSAD 61 circulated a parental consent and risk acknowledgment form, which had been in use since April 2019. ECF Doc. 1, PageID # 6 (Compl. ¶ 23); ECF No. 1-1, PageID # 34-36 (Compl. Ex. A). The consent form stated, among other things, that risks associated with the trip were "the possibility of hiking falls" and "cold weather," and listed "first aid kits on site, multiple chaperones and experienced hikers" as "safety measures." ECF Doc. 1, PageID # 6 (Compl. ¶¶ 27-28); ECF Doc. 1-1, PageID # 34 (Compl. Ex. A). In addition to the consent form, prior to the September 2021 Senior Awareness Trip, MSAD 61 held "several" meetings with students attending the trip. ECF Doc. 1, PageID # 7 (Compl. ¶ 29). At those meetings, MSAD 61 employees told the students that they "would be permitted to stop hiking and 'go back' at any point during the approximately 11-hour planned hike." ECF Doc. 1, PageID # 7 (Compl. ¶ 30). MSAD 61 employees also told students that there would be no cell phone service on or around the hike location, and that chaperones would have personal radios to communicate between groups of students/chaperones on the trail. ECF Doc. 1, PageID # 7 (Compl. ¶¶ 33-34).

Plaintiffs allege that the School Defendants "knew or reasonably should have known that the planned hike was challenging, lengthy, strenuous, and included difficult features such as slides and rock scrambles that may not have been appropriate for all students," and that "appropriate and reasonable safety and emergency measures available to chaperones and/or staff on the Senior Awareness Trip were either unreasonably deficient and/or inadequate, or entirely lacking." ECF Doc. 1, PageID # 26 (Compl. ¶¶ 148-49). Specifically, Plaintiffs allege that:

3

- Teachers and chaperones did not conduct "a routine 'safety check' of students attending the Senior Awareness Trip to evaluate and determine whether each student was properly outfitted with the requisite safety gear," ECF Doc. 1, PageID # 13 (Compl. ¶ 57);

- Teachers and chaperones did not bring any automatic electronic defibrillators (AEDs) on the trip, ECF Doc. 1, PageID # 13 (Compl. ¶ 58);

- Chaperones and staff on the trip "lacked satellite communications devices capable of accessing outside emergency medical services from any location at the destination," ECF Doc. 1, PageID # 9 (Compl. ¶ 42).

The Complaint is ambiguous as to the extent of first aid training and hiking experience among the teachers and chaperones on the trip. However, a fair reading of the Complaint, even in the light most favorable to Plaintiffs, indicates that at least three teachers had "extensive" hiking experience, five teachers were CPR-certified, and three teachers were first aid-certified. ECF Doc. 1, PageID # 10-11 (Compl. ¶¶ 47, 50-51).

**C.   The Incident**

On September 12, 2021, chaperones and student participants traveled to South Baldface Mountain for the Senior Awareness Trip. ECF Doc. 1, PageID # 13-14 (Compl. ¶¶ 56, 61-62). There were about "30 to 40 students in attendance," including Decedent, and "approximately 6 to 8 adult chaperones." ECF Doc. 1, PageID # 14 (Compl. ¶ 63). The group started hiking up the Bald Face Circle Trail around 8:45 a.m. ECF Doc. 1, PageID # 14 (Compl. ¶ 62).

Daggett was the teacher who had been "designated as the 'Sweeper' to walk with and assist the slowest students in at the rear of the hiking party." ECF Doc. 1, PageID # 14 (Compl. ¶ 64). Decedent was hiking "at a slow pace," and was in Daggett's group. ECF Doc. 1, PageID # 14 (Compl. ¶ 64). About 15 minutes into the hike, Decedent "expressed that he was fatigued, unable to continue on the hike, and wanted to 'go back.'" ECF Doc. 1, PageID # 14 (Compl. ¶ 65). Daggett "informed Decedent that he could not stop" and "instructed Decedent to 'push on'" to a shelter located about 2.2 miles along the trail, halfway between the trailhead and the summit. ECF

Doc. 1, PageID # 15 (Compl. ¶¶ 66, 70). Decedent continued to request to stop or turn back, to which Daggett allegedly "responded by yelling at Decedent to 'get the fuck up' the trail." ECF Doc. 1, PageID # 15 (Compl. ¶ 68). Decedent and Daggett reached the halfway shelter, where Decedent ate and drank. ECF Doc. 1, PageID # 15 (Compl. ¶¶ 70-71). When the group began hiking onward after lunch, Decedent again expressed fatigue, appeared visibly unwell, and requested to "go back," which Daggett did not allow him to do. ECF Doc. 1, PageID # 15-16 (Compl. ¶¶ 72-76). Daggett also allegedly "denied or rationed" water to Decedent. Compl. ¶ 79. "[T]hroughout the entirety of the hike, [Daggett] either denied or allowed no more than short, two-minute breaks." ECF Doc. 1, PageID # 18 (Compl. ¶ 82).

Around 4:30 p.m., while descending the trail, Decedent collapsed and was unable to stand. ECF Doc. 1, PageID # 18 (Compl. ¶ 84). Daggett "radioed down for help using walkie talkies," and three chaperones and several students who had been further down the trail "ran back up towards Decedent and [Daggett]." ECF Doc. 1, PageID # 18 (Compl. ¶¶ 85-86). Decedent attempted to consume food and water and continue hiking, but collapsed again after fifteen minutes. ECF Doc. 1, PageID # 18 (Compl. ¶¶ 87-89). At this point, another chaperone "ran to his vehicle and drove to a location where he could access cellular service," and called 911 around 7:04 p.m. ECF Doc. 1, PageID # 18-19 (Compl. ¶¶ 90-93). The students and chaperones who were present with Decedent attempted to carry him down the trail but were unable to, and his condition continued to worsen. ECF Doc. 1, PageID # 19-20 (Compl. ¶¶ 95-101). First responders reached Decedent sometime before 8:20 p.m. but were unable improve his condition. ECF Doc. 1, PageID # 20 (Compl. ¶¶ 102-04). Decedent stopped breathing around 8:23 p.m. and was pronounced dead at 9:03 p.m. ECF Doc. 1, PageID # 20-21 (Compl. ¶¶ 104-109).

**ARGUMENT**

I. **The Legal Standard for Analysis of a Rule 12(b)(6) Motion**

Federal Rule of Civil Procedure 12(b)(6) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief, with enough factual detail to make the asserted claim plausible on its face." *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). "Plausible" means "more than merely possible." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017).

While a court will accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor, it will not credit "conclusory legal allegations" or "factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods*, 36 F.4th at 33–34 (citations and internal quotation marks omitted).

II. **The Legal Standard for Municipal Liability Under Section 1983**

The Complaint includes five federal law claims under 42 U.S.C. § 1983. Counts I through IV are pled solely against MSAD 61, and Count V is pled against "M.S.A.D. #61, Daggett and Smith, acting in official capacity," ECF Doc. 1, PageID # 25, which the School Defendants construe to mean that both individuals are being sued in their official capacity. A suit brought against an individual in their official capacity "is tantamount to a suit against the entity of which the official is an agent," *Burrell v. Hampshire Cty.*, 307 F.3d 1, 7 (1st Cir. 2002); thus, all of

Plaintiffs' federal law claims have been brought solely against the entity (MSAD 61), and the Court will apply the same legal standard to all five counts.

As Plaintiffs appear to recognize, the standard they must meet to establish liability of a municipal entity such as MSAD 61 is governed by the United States Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "Municipal liability under *Monell* has two basic elements, both of which must be plausibly pled in order for a claim to survive: first, that the plaintiff's harm was caused by a constitutional violation, and second, that the municipal defendants be responsible for that violation." *Johnson v. City of Biddeford*, --- F. Supp. 3d ---, 2023 WL 2712861, at *29 (D. Me. Mar. 30, 2023) (cleaned up).

### A.      *Monell* Element One – Constitutional Violation

A *Monell* claim cannot be based on ambience; rather, such a claim must be based on some "underlying, *identifiable* constitutional violation." *Kennedy v. Town of Billerica*, 617 F.3d 520, 531 (1st Cir. 2010) (emphasis added); *see also Johnson*, 2023 WL 2712861, at *29 ("[I]f there is no underlying constitutional violation, there can be no municipal liability."). Thus, the first step of any *Monell* analysis must be to identify the constitutional wrong, if any, that caused the plaintiff's injury.

The Due Process Clause does not "guarantee due care by government officials," *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59 (1st Cir. 2020) (quotation marks omitted). Rather, substantive due process protects "against behavior so extreme as to shock the conscience," meaning "conduct that is truly outrageous, uncivilized, and intolerable." *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999) (quotation marks omitted). "The burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)

7

(cleaned up). Although the "conscience-shocking" terminology alone may be vague and unhelpful, even ambiguous,[2]

> certain principles have emerged from the case law. Executive acts that shock the conscience must be truly outrageous, uncivilized, and intolerable, and the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error. Indeed, a hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (cleaned up); *see also Waybright v. Frederick Cty.*, 528 F.3d 199, 205 (4th Cir. 2008) ("For a due process challenge to executive action to succeed, the general rule is that the action must have been intended to injure in some way unjustifiable by any government interest." (quotation marks omitted)); *Rivera v. Rhode Island*, 402 F.3d 27, 38 (1st Cir. 2005) (noting that the shock-the-conscience test "is meant to give incentives to prevent such gross government abuses of power as are truly outrageous").

The Supreme Court has also held that government inaction "simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Thus, in most circumstances, the government's "failure to protect an individual" does not violate due process. *Id.* The state-created danger doctrine stems from the recognition that some affirmative acts by a governmental actor may create or enhance a risk of harm, specific to the plaintiff, from a private actor or natural event. *See Rivera*, 402 F.3d at 34-35 (explaining that establishing a substantive due process violation "is much more difficult when the person who inflicts the injury is a private person," but that some courts "have recognized the existence of a

---

[2] Importantly, whether governmental action is conscience-shocking in the constitutional sense has nothing to do with whether we might describe the events as "shocking" in colloquial speech. A high school student's death on a hiking trip is a shocking occurrence no matter how it comes about. But the constitutional question is whether the governmental action is "outrageous, uncivilized, and intolerable." *Hasenfus*, 175 F.3d at 72 (quotation marks omitted).

constitutional violation when, on particular facts, the state fails to protect against private violence under [a] state created danger theory"); *Johnson*, --- F. Supp. 3d ---, 2023 WL 2712861, at *13 (noting that a state-created danger claim has four elements: "(i) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff; (ii) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public; (iii) that the act or acts caused the plaintiff's harm; and (iv) that the state actor's conduct, when viewed in total, shocks the conscience").

In other words, the distinction between a "state-created danger" claim and a "traditional" substantive due process claim is based on how the injury ultimately comes about: through a state actor's direct act, or by a private individual or natural occurrence. In a "traditional" substantive due process claim, a state actor inflicts harm directly upon the plaintiff. By contrast, a state-created danger claim is invoked in circumstances in which the plaintiff's injury is inflicted by a private actor or a natural event. In a case like this one, where there is no allegation that any state actor inflicted any injury directly upon Decedent, all of Plaintiffs' federal claims are properly conceived of as state-created danger claims. But under either theory, the fundamental question is whether the governmental <u>action</u> is conscience-shocking. *See Rivera*, 402 F.3d at 38 ("[I]n a state creation of risk situation, where the ultimate harm is caused by a third party, courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action." (quotation marks omitted)); *Ye v. United States*, 484 F.3d 634, 640-41 (3d Cir. 2007) (holding that government doctor's badly mistaken assurance that patient's coughing was "nothing to worry about" did not constitute an affirmative act that could support state-created danger claim); *Abdisamad v. City of Lewiston*, No. 2:19-CV-00175-LEW, 2019 WL 3307039, at *2-3 (D. Me. July 23, 2019) ("The state-created danger theory does not relieve a plaintiff of the

9

burden of setting forth factual allegations that depict a scenario involving conscience-shocking behavior."), *aff'd*, 960 F.3d 56.

### B. Element Two – Municipal Liability

A local government entity, such as a school district, "cannot be held liable under § 1983 for the actions of its employees based solely on a theory of respondeat superior." *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002). "Rather, liability can be imposed on a local government only where that government's policy or custom is responsible for causing the constitutional violation or injury." *Id.* Federal courts recognize "four types of practices that permit a § 1983 suit against a municipality: (1) a formally adopted municipal policy; (2) the actions or decisions of a municipal official with final policymaking authority; (3) a practice so persistent and widespread that it constitutes a custom or usage; and (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference." *Doe v. City of New York*, 2018 WL 3824133, at *8 (E.D.N.Y. Aug. 9, 2018). "[A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and a "municipality's failure to train or supervise only becomes a basis for liability when action pursuant to official municipal policy of some nature caused a constitutional tort," *Abdisamad*, 960 F.3d at 60 (cleaned up). Moreover, a failure to train "can only yield liability against a municipality where that city's failure to train reflects <u>deliberate indifference to the constitutional rights</u> of its inhabitants," *City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (emphasis added). Deliberate indifference requires notice of the deficiency of the training. *See Connick*, 563 U.S. at 61 ("Deliberate indifference . . . requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action." (cleaned up)).

Here too, Plaintiffs' citation to the state-created danger doctrine does not change the municipal liability analysis. The state-created danger doctrine, as just noted, is simply an

alternative basis to <u>establish an underlying constitutional violation</u> based on harm that is directly inflicted by a private person or natural event, rather than a state actor.  But the municipality may be liable for its employee's constitutional violation only if *Monell* is also satisfied.  As the First Circuit explained (and as this Court had also noted[3]) in *Abdisamad*, even in the state-created danger context, "liability can be imposed on a local government only where that government's policy or custom is responsible for causing the constitutional violation or injury."  960 F.3d at 60; *see also Rivera*, 402 F.3d at 38-39 ("Since the plaintiff has failed to state a constitutional claim at all, her claims against the [municipal defendant] for . . . failure to train fail."); *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 174-75 (3d Cir. 2017) (holding that individual high school football coach "may be held liable [under a state-created danger theory] where the coach requires a player, showing signs of a concussion, to continue to be exposed to violent hits" by other players, but that school district was not liable under *Monell* because plaintiffs had shown no "evidence that would suggest deliberate indifference to a pattern of recurring injuries").

### III.  Plaintiffs Have Failed To Plausibly Allege A Constitutional Violation

As explained above, all five of Plaintiffs' claims against the School Defendants – regardless of whether they are characterized as straight due process claims or state-created danger claims – require them to establish two elements: first, the existence of an "identifiable" constitutional violation, *Kennedy*, 617 F.3d at 531; and second, that any such identifiable violation can be attributed to MSAD 61 under *Monell*.  Plaintiffs cannot satisfy both elements.  The only conduct alleged in the Complaint that arguably establishes a constitutional violation (rather than mere negligence) is Daggett's conduct during the hike, but the Complaint does not plausibly allege

---

[3] In *Abdisamad*, this Court had concluded that the complaint failed to state a claim that any municipal employee "engaged in acts or omissions that exposed [a student] to a special hazard."  2019 WL 3307039, at *3.  However, the Court noted that even if there was such an allegation as to a municipal defendant, the municipality "is not automatically liable for constitutional deprivations imposed by its employees," but that Monell's policy or custom standard must also be satisfied.  *Id.* at *3 n.7.

11

that Daggett's conduct is attributable to MSAD 61 under *Monell*. The claims against the School Defendants must fail.

          1.         <u>*Monell* Element One: Identifying the Alleged Constitutional Violation</u>

To determine whether Plaintiffs have alleged an identifiable constitutional violation, the first step of the analysis – under either a "traditional" substantive due process theory or a state-created danger theory – is to identify the governmental action, if any, that shocks the conscience. *Rivera*, 402 F.3d at 36 ("In determining whether the state has violated an individual's due process rights, a federal court may elect first to address whether the governmental action at issue is sufficiently conscience-shocking."). In this case, there is no allegation that any state actor inflicted any physical harm directly upon Decedent, and all five of Plaintiffs' federal claims are based on essentially the same state-created danger theory. Accordingly, under the first step of *Monell* – whether there is a constitutional violation and, if so, what that violation consists of – the analysis of all five of Plaintiffs' claims will be the same.

The governmental action on which Plaintiffs' constitutional claims appear to be principally based are the planning, preparation, and supervision of the Senior Awareness Trip. Plaintiffs thus devote a significant portion of their lengthy Complaint to pleading allegations intended to establish that MSAD 61 organized and approved an unreasonably demanding hike and did not devote sufficient safety measures on the Senior Awareness trip in light of the difficulty of the hike.[4] But the Due Process Clause is not a means to second-guess the field-trip-planning and resource-allocation decisions of school officials acting in good faith; rather, the constitutional question is

---

[4] The Complaint also alleges that Daggett forced the Decedent to continue with the hike even after he appeared to be in medical distress. Those allegations are discussed more fully below.

whether the Complaint plausibly alleges that these governmental actions were so egregiously and obviously wrong as to shock the conscience.

The answer is no. Even when the Complaint's factual allegations are viewed in the light most favorable to Plaintiffs, the planning, organization, and safety precautions associated with the hiking trip amount to, at most, a claim of negligence – bad judgment, not "malice or sadism." *Harron*, 660 F.3d at 536. Indeed, Plaintiffs impliedly recognize as much when they allege that MSAD 61 had a policy of "condoned negligence." ECF Doc. 1, PageID # 22 (Compl. ¶ 120). The factual allegations regarding MSAD 61's actions in planning and operating the trip simply do not approach the level of extremity or egregiousness that is required to adequately allege, let alone succeed on, a due process claim.[5] *See Abdisamad*, 2019 WL 3307039, at *2-3 ("The fact that there is nothing in the [complaint] that would permit the reader to contemplate whether the case involves negligence or conscience-shocking conduct demonstrates that [p]laintiff has failed to state a substantive due process claim."). Thus, the vast majority of the governmental conduct alleged in the Complaint does not support a claimed constitutional violation.

2. *Monell* Element Two: Municipal Liability for Any Violations Committed by Daggett

The one thing that Plaintiffs do identify that might plausibly be considered to be conscience-shocking is the allegations that Daggett urged Decedent to continue up the mountain despite his manifest physical distress, and that she did not allow Decedent to rest or turn back. But

---

[5] There is one additional reason that the Complaint's allegations regarding the trip's planning and management cannot establish a state-created danger claim: the factual allegations do not plausibly show that the insufficient safety planning "created or enhanced a danger specific to the plaintiff," as is also required to state a state-created danger claim. *Johnson*, 2023 WL 2712861, at *13. There were "30 to 40 students" on the trip. ECF Doc. 1, PageID # 14 (Compl. ¶ 63). The Complaint does not allege that at the time the trip began, Decedent had an abnormal risk of a medical crisis that the poor safety planning would exacerbate, let alone that the School Defendants had any knowledge of any medical condition. To the extent that the subpar safety planning increased the danger to participants on the hike, that danger was not "specific to the plaintiff." *Johnson*, 2023 WL 2712861, at *13.

13

even if the Complaint adequately alleges that Daggett's conduct violated Decedent's constitutional rights, Plaintiffs do not plausibly allege that Daggett's actions are attributable to the School Defendants' policies, customs, failure to train, or final decision, as municipal liability under *Monell* requires. In fact, the Complaint affirmatively refutes that argument and alleges that Daggett violated MSAD 61's policies. Thus, the Complaint does not state a claim against the School Defendants under *Monell* based on Daggett's conduct.

### A. Policy

Plaintiffs start, in Count I, with the allegation that MSAD 61 had an "official policy of condoned negligence" that is reflected in the "official [Senior Awareness Trip] policies." ECF Doc. 1, PageID # 22 (Compl. ¶ 120). This theory fails. A municipality's "official policy" for municipal purposes includes such things as "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Other than the bald allegation that MSAD 61 had an "official policy of condoned negligence," the Complaint does not allege, and it is not remotely plausible to think, that MSAD 61 had an official policy that chaperones would not allow students to rest or turn back during the trip. Indeed, the factual allegations in the complaint are to the contrary: the Complaint makes clear that Daggett's conduct in that respect violated MSAD 61's policies. The Complaint repeatedly, affirmatively, and exclusively alleges that Daggett's conduct in that respect *violated* MSAD 61's policies and protocols.[6] *See* ECF Doc. 1, PageID # 7, 14-15, 27, 29 (Compl. ¶¶ 30, 64-66, 151, 161); *see also Berry*, 2016 WL 742901, at *18 ("[I]n order to attach liability [against a municipality under

---

[6] To be sure, Rule 8(d) permits Plaintiffs to allege inconsistent facts and plead claims in the alternative, but the Complaint simply does not contain any allegations that tie Daggett's conduct to the School Defendants' policies or actions.

14

*Monell*], the [p]laintiff must point to a policy, not a violation of a policy, as the source of the constitutional violation." (quotation marks omitted)).

### B. Custom

In Count II, Plaintiffs against allege that MSAD 61 engaged in "condoned negligence," ECF Doc. 1, PageID # 23 (Compl. ¶ 126), this time basing their theory of liability on custom. And here again, there are not plausible allegations to support municipal liability. Although "municipalities' policies not authorized by written law can nevertheless be actionable, they must be so permanent and well settled as to constitute a custom or usage with the force of law." *Abdisamad*, 960 F.3d at 60 (quotation marks omitted). There is no allegation in the Complaint that any chaperone on the hiking trip – an event that had been run annually for nearly two decades – had previously refused to allow a distressed and visibly unwell student to rest or turn back during the trip, nor can the existence of such a practice be plausibly inferred from common experience.

### C. Failure to Train

Next, in Count III, Plaintiffs set out a failure to train claim. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick*, 563 U.S. at 61, and a "municipality's failure to train or supervise only becomes a basis for liability when action pursuant to official municipal policy of some nature caused a constitutional tort," *Abdisamad*, 960 F.3d at 60 (cleaned up). Moreover, a failure to train "can only yield liability against a municipality where that city's failure to train reflects <u>deliberate indifference to the constitutional rights</u> of its inhabitants." *City of Canton*, 489 U.S. at 392 (emphasis added). Deliberate indifference requires notice of the training's deficiency. *See Connick*, 563 U.S. at 61 ("Deliberate indifference . . . requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action." (cleaned up)). Thus, in order to state a *Monell* failure-to-train

claim, the Complaint must plausibly allege that MSAD 61 had <u>notice</u> that its alleged lack of training would "cause constitutional violations." *Id.* (quotation marks omitted).

It does not. Even if the Complaint adequately alleges that Daggett's conduct violated Decedent's constitutional rights, Plaintiffs do not allege (and there is no plausible basis to think, based on the Complaint's factual allegations or common sense) that it was "known or obvious" to MSAD 61 that a teacher chaperoning the Senior Awareness Trip would disregard or exacerbate a student's physical distress. To the contrary, the Complaint alleges that Daggett violated MSAD 61's policies in refusing to allow Decedent to rest or turn back. *See Abdisamad*, 960 F.3d at 60.

Plaintiffs do allege that MSAD 61 knew or reasonably should have known that no one on the hike (including Daggett) was adequately trained or certified "to prevent, detect, remediate, and/or respond to a serious medical event like that experienced by Decedent." ECF Doc. 1, PageID # 27 (Compl. ¶ 152). But that is simply another way of restating the Plaintiffs' general allegation that the planning and safety precautions for the Senior Awareness Trip were unreasonably deficient – which, as explained above, is an allegation of negligence, not a constitutional violation. The Court should reject the Complaint's attempt to conflate a negligence claim with a *Monell* claim based on failure to train. *See Rivera*, 402 F.3d at 38 ("[C]ourts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action." (quotation marks omitted)).

### D. Final Decisionmaker

Plaintiffs allege in Count IV that Superintendent Smith was a final decisionmaker and engaged in conscience-shocking behavior. Although a municipal policy "may be established by a single decision by municipal policymakers under appropriate circumstances," liability of the municipality under such circumstances will only attach where the "decisionmaker possesses final

authority to establish municipal policy with respect to the action ordered." *Kelley*, 288 F.3d at 9 (quotation marks omitted).

There are at least two reasons why this claim fails. In the first place, Plaintiffs' allegation that Superintendent Smith is a final decisionmaker is wrong as a matter of law. In Maine, it is well established that local school boards are granted broad authority over the management of their public schools. The Legislature has granted school boards the authority to manage school property, to select a superintendent, to determine the course of study, to expel students, and to develop certain hiring practices. *See generally* 20-A M.R.S. § 1001. Most importantly, it is the school board – and not the superintendent – that is authorized under state law to "adopt policies that govern school administrative units." *Id.* at § 1001(1-A).[7]

Second, the only "final decisions" of Superintendent Smith alleged in the Complaint are the decisions to proceed with the Senior Awareness Trip. But as explained above, the trip itself – including its planning and safety precautions – simply was not a constitutional tort. And to the extent that Daggett's alleged conduct might rise to that extreme level, the Complaint does not allege, nor is there any plausible basis to infer, that Superintendent Smith directed Daggett to engage in such actions as urging students to exceed their physical capabilities or refusing to allow them to rest or turn back.

For the foregoing reasons, even if the Complaint adequately alleges that Daggett's conduct during the hike violated Decedent's constitutional rights, the Complaint fails to state a claim that such a violation can be attributed to the School Defendants under *Monell*. Accordingly, Counts I through V should be dismissed.

---

[7] Section 1055 of the education statutes sets forth the powers and duties of the superintendent. That provision of state law provides that the superintendent is the secretary of the school board, and performs such duties as the school board directs. Listed among the duties of the superintendent are the following: a) keeping records of votes and proceedings; b) keeping all financial records and accounts; c) inspecting schools; d) enforcing the rules of the school board; and e) nominating teachers and principals for employment. *See* 20-A M.R.S.A. § 1055.

## IV. The Court Should Decline Jurisdiction Over the Pendent State-Law Claims

In *United Mine Workers of America v. Gibbs,* the United States Supreme Court stated that "[n]eedless decision of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable law." 383 U.S. 715, 726 (1966). Thus, in general, "the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit will trigger the dismissal without prejudice of any supplemental state-law claims." *Lambert v. Fiorentini,* 949 F.3d 22, 29 (1st Cir. 2020) (cleaned up). In the event that this Court dismisses the federal law claims pled in Counts I through V, the only claims left will be state law tort claims that involve issues of Maine law, including the applicability of various immunity provisions of the Maine Tort Claims Act. It is in the interests of comity, therefore, that if this Court dismisses Counts I through V, it dismiss Counts VI and VII without prejudice. *See, e.g.*, *Carey ex rel. Carey v. Me. Sch. Admin. Distr. No. 17,* 754 F. Supp. 906, 927 (D. Me. 1990).


Dated: October 27, 2023           */s/ Melissa A. Hewey*_____
                                  Melissa A. Hewey
                                  Oliver M. Walton
                                  **DRUMMOND WOODSUM**
                                  84 Marginal Way, Suite 600
                                  Portland, Maine 04101-2480
                                  (207) 772-1941
                                  mhewey@dwmlaw.com