UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| AMY C. TAIT and CHRISTOPHER L. STRECKER, Co-Personal Representatives of the Estate of MICHAEL T. STRECKER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:23-cv-00329-LEW |
| LAKE REGION SCHOOL DISTRICT (M.S.A.D. #61), ALAN SMITH, and JESSICA DAGGETT a/k/a JESSICA DIBIASE, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>ORDER ON MOTIONS TO DISMISS</u>

Michael T. Strecker, a high school student, died of exertional heatstroke while participating in a strenuous hike sponsored by the Lake Region School District.  In this action, his parents, Amy C. Tait and Christopher L. Strecker ("Plaintiffs"), assert, among other claims, that Michael's death was the result of the School District, Superintendent Alan Smith, and teacher Jessica Daggett's violation of the Fourteenth Amendment of the United States Constitution.  The matter comes before the Court on the Defendants' motions to dismiss the constitutional claims with prejudice and to dismiss supplemental state law claims without prejudice, for lack of subject-matter jurisdiction.  Mot. to Dismiss of Defs. Lake Region Sch. Dist. and Alan Smith (ECF No. 10); Def. Jessica Daggett's Mot. to

Dismiss (ECF No. 13); Defs. Lake Region Sch. Dist. and Alan Smith's Mot. to Dismiss (ECF No. 27); Def. Jessica Daggett's Mot. to Dismiss (ECF No. 28).

**BACKGROUND**

The background to this case is drawn from the Plaintiffs' First Amended Complaint ("FAC," ECF No. 24) and a form attached to the original complaint titled Consent of Parent or Guardian & Acknowledgment of Risk ("Consent & Acknowledgment Form," ECF No. 1-1).   For purposes of a motion to dismiss, all of Plaintiffs' non-conclusory factual allegations are accepted as true.

Alan Smith is the Superintendent of Lake Region School District, which serves the communities of Bridgton, Casco, and Naples.  Lake Region School District is also known as Maine School Administrative District 61 (the "District").   Jessica Daggett is a humanities teacher at the District's Lake Region High School.   In September of 2021, Michael Strecker was a rising senior in the Class of 2022.  Plaintiffs state in their Amended Complaint that Michael had a body mass index of 36.3, and as such was "severely obese" under standards set by the Center for Disease Control and Prevention.[1]

For roughly 20 years, the Lake Region High School has conducted a "Senior Awareness Trip" in the fall of the school year that involves a day of hiking in the White Mountains and an overnight at a campground.  In September 2021, the hike was set for South Baldface Mountain with an overnight at the Cold River Campground in North

---

[1] Plaintiffs suggest that someone working for the District should have evaluated Michael's fitness to participate and denied him the opportunity to participate in the hike portion of the Trip.  FAC ¶ 83.  They also imply that they could not have exercised their own discretion in this regard because they were not sufficiently informed about the exertional requirements of the hike.

2

Chatham, New Hampshire.  The Appalachian Mountain Club classifies the Baldface Circle Trail as a strenuous hike, measuring 10.7 miles, with a 3,600-foot elevation change, and requiring roughly seven hours for an average hiker to complete.  The upper section of the trail involves ledge terrain above the tree line with little shade.

The District's Senior Awareness Trip is not compulsory.  A form the School District sent home with students informed parents that the trip would expose their children to hazards associated with hiking and swimming, in particular falling and cold weather, but also including "personal and potentially serious injury or death due to an unforeseeable event."  Consent & Acknowledgement Form at 1.  Plaintiffs allege that this warning of risks was insufficient because it did not describe exertional heatstroke as a particularly likely risk, nor the possibility that chaperones would fail to recognize the signs and symptoms of heatstroke.  According to Plaintiffs, the leaders of the Trip, including Daggett, in fact did not know the signs and symptoms of heatstroke.  Plaintiffs also allege that the warning in the Consent & Acknowledgement Form was insufficient because it did not advise parents and students that the trip would require high levels of exertional activity and decent fitness, that there was no cell service on the trail, that trip leaders were not bringing along satellite phones to ensure that they would be able to contact emergency services, and that trip leaders were only bringing first aid kits and not portable, automatic electronic defibrillators ("AEDs").[2]  Plaintiffs also observe that while all of the chaperones had CPR training, none were trained or certified in advance life support.  Plaintiffs also allege

---

[2] School personnel or chaperones did inform students "that there would not be cellular phone service on-site at/around the destination."  FAC ¶ 51.

deficiencies based on the Consent & Acknowledgment Form's indication that sneakers were suitable footwear. They also highlight the Form's statement that students would be required to "abide by the rules and regulations including the directions and instructions from school administrators, instructors, and supervisors as imposed on students while participating in the program(s) or activity(ies)," upon risk of disciplinary action. *Id.* at 2, ¶¶ (c), (d).

When Michael and the other students met with school personnel and/or chaperones to discuss the upcoming trip, those individuals represented that students would be able to turn back at any point during the hike. They also stated that the District would supply water, but that students should bring a container with at least one quart of water. One quart of water is not a sufficient amount of water for an individual to consume over the length of the planned hike. Of necessity, water bottles would need to be refilled, and extra water was carried by some of the hike's participants and chaperones. Although the District personnel did provide the Consent Form for parents and discussed the trip with students in advance, the District did not have an informational meeting for parents and did not otherwise inform parents about the lack of AEDs, satellite communications, cell reception, body temperature thermometers, or other possible safety measures or devices.

On the fateful day, thirty to forty students started out with six to eight adult chaperones. Daggett was designated as the group's sweeper, meaning she would stay behind with the slower-moving students. Roughly fifteen minutes into the hike, Michael told Daggett that he wanted to turn back. Daggett encouraged Michael to "push on" and he did. At the time, Michael appeared pale and had blue-colored lips. Less than an hour

4

into the hike, Michael still appeared pale and again expressed his desire to go back.  Daggett pushed Michael to continue, allegedly yelling at him to "get the fuck up" the trail.  FAC ¶ 96.  Daggett's resistance to Michael's entreaties was inconsistent with the pre-hike representation that students would be permitted to stop hiking and turn back upon their request.  Nonetheless, Plaintiffs allege that Daggett's denial of Michael's entreaties to turn back and her insistence that he continue despite obvious signs of distress "were intended to be consistent with and in accordance with" the District's alleged "custom of pushing students to exert themselves."  *Id.* ¶ 112.

The process of hiking, stopping, and requesting to go back repeated itself, with Michael eventually reaching the base of the summit of Baldface Mountain.  However, sometime after eating lunch and before reaching the base of the summit, Michael vomited.  Vomiting is a known sign of heatstroke.  It is unclear whether Daggett was aware of this occurrence.  The Plaintiffs allege that Daggett lost sight of Michael for approximately 30 minutes.  They also allege that, sometime during this leg of the hike, Daggett stated to Michael that although he may hate her at the moment, he would later be glad for being pushed.

At some point during the ascent, an experienced adult hiker who was not part of the school group saw Michael on the trail.  According to this individual, Michael looked "visibly out of it" and should not have continued hiking.  *Id.* ¶ 107.

Plaintiffs also allege that Daggett at times denied Michael's requests for water and denied him anything longer than a two-minute break.

After reaching the tree line, Michael did not summit, but rested a while before starting the descent, at which time he was in the company of a different chaperone. Michael continued to struggle on the hike down. At roughly 3:00 p.m., Daggett caught up to Michael. Plaintiffs have not provided any facts about this encounter.

At 4:30 p.m., Michael collapsed while still a good distance from the trail head. At that time, the sweeping group of students were out of water. Someone sent students ahead to retrieve water from others who were further down the trail. Daggett also radioed for help from other chaperones, who sent a student and chaperone up the trail with water. When they arrived, someone provided Michael with trail mix, chocolate, and water before assisting him to his feet. Michael proved unable to continue hiking for more than fifteen minutes. Meanwhile, a chaperone drove away from the trail head until cell service was available. However, it was not until 7:00 p.m. that emergency services were contacted. Back on the mountain, chaperones other than Daggett attended to Michael. They were not able to carry Michael any significant distance because they did not have a means of doing so. Eventually, emergency responders arrived. Sometime after their arrival, Michael stopped breathing. The emergency responders did not have a portable AED, but they were able to retrieve one. When they applied the device, it recommended continued CPR rather than a shock to stimulate Michael's heart. However, by 9:00 p.m., Michael was deceased due to exertional heatstroke.

In the aftermath of the tragic death of Michael Strecker, various critiques related to hike preparations have been leveled at the School District and Superintendent Smith (who was not in attendance on the hike). These include all of the alleged shortcomings in

preparation previously described.  In addition, Plaintiffs quote various statements made by Smith during a post-trip meeting for students and their parents.  According to Plaintiffs, Smith's statements "laid bare the defective nature of [the District's] policies and plan" for the Trip.  *Id.* ¶ 67.  Among the statements was one indicating that because the Trip had occurred for almost twenty years without serious incident there was some presumption that that would continue to be the case, and another statement that those in charge of the Trip had not asked "enough questions."  *Id.*  Yet another statement indicated that the Consent & Acknowledgement Form was under review.  Smith stated that for future trips, "absolutely" portable AEDs would be carried.  *Id.* ¶ 73.  Smith also stated that he was unaware that the Trip and/or hike would occur outside of cell service.

In Count I of the seven-count First Amended Complaint, Plaintiffs assert a claim against the District, with subparts referencing different aspect of the legal categories for municipal liability claims recited in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  More specifically, Plaintiffs claim that Michael died due to the District's "official policy," FAC ¶ 158, "long-standing" "unwritten custom," *id.* ¶ 169, failure to properly equip or train, *id.* ¶ 176, and/or an unconstitutional decision by someone with policy-making authority for the District "who planned and led the Senior Awareness Trip and made final decisions about it," *id.* ¶ 180.  Plaintiffs describe the allegedly unconstitutional policy or custom as one of conduct "so extreme and egregious as to shock the contemporary conscience."  *Id.* ¶ 160.  They further allege that the District adopted an unconstitutional policy consisting of:

choosing not to meet with parents of students participating in the District's "Senior Awareness" Trip; choosing not to adequately prepare students and parents/guardians for the risks of the Trip by providing adequate instructions and warnings; choosing to rely on students to communicate information about the Trip with the parents/guardians; choosing not to communicate the significant risks of the trip to students and their parents/guardians; choosing not to counsel, advise, assess, or otherwise evaluate student physical fitness and competency to undertake such a grueling excursion; bringing students on a challenging hike as part of the District's "Senior Awareness" Trip and pushing those students to continue and complete the challenging hike as part of a "bonding" experience; failing to provide adequate first aid kits; failing to provide portable AED equipment; failing to provide satellite telephones or communication technology in order to call first responders from any point on the hike; failing to provide chaperones trained in Advanced Life Support and the use of AED equipment; failing to provide chaperones trained to assess and respond appropriately to signs of heat exhaustion and exertional heatstroke; and failing to provide chaperones trained in medical evacuations from a mountain trail setting.

*Id.* ¶¶ 162, 170.  As the Plaintiffs see it, the District's policy or custom reflects a deliberate choice "not to enact a policy that would take obvious steps to address" the risks associated with the Trip.  *Id.* ¶¶ 164, 172.  They claim that these choices amount to deliberate indifference toward Michael's constitutional rights.  *Id.* ¶¶ 165, 174.

Plaintiffs' failure-to-train theory and "final decisionmaker" theory are akin to their policy or custom theories, but assign fault to decisionmakers who had the authority to establish training standards and set the safety requirements for the outing, whether acting on their own or through their duly appointed delegates.  *Id.* ¶¶ 177, 182.  Plaintiffs also allege that the sum total of these acts "resulted in [a] fatal, state-created danger," *id.* ¶ 182, the fifth and final aspect of their municipal liability claim in Count I, *id.* ¶ 187.

8

In Counts II and III, Plaintiffs similarly rely on due process, custodial-care, and state-created danger principles to allege that Daggett is liable for the violation of Michael's constitutional rights in both her official (Count II) and personal (Count III) capacities. *Id.* ¶¶ 205, 211, 233, 239.

In Counts IV and V, Plaintiffs claim that Superintendent Smith is also liable for the violation of Michael's constitutional rights in his official (Count IV) and personal (Count V) capacities. *Id.* ¶¶ 262, 268, 287. However, Plaintiffs now concede that Count V fails to state a claim.[3]

All of the federal claims arise under 42 U.S.C. § 1983 ("Section 1983"), which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

In Counts VI and VII, Plaintiffs assert state law claims.

---

[3] Plaintiffs concede that their personal liability claim against Smith should be dismissed. Pls.' Opp'n to District's Mot. at 10 (ECF No. 29). This is appropriate. Supervisors are not liable for the unconstitutional acts of subordinates simply because of their supervisory authority. Instead, their liability must be based on their own acts or omissions, *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 91–92 (1st Cir. 1994), which acts or omissions must reflect "reckless or callous indifference to the constitutional rights of others" and be affirmatively linked to the subordinate's unconstitutional behavior, *id.* at 92. Smith did not participate in the Senior Awareness Trip and there is no allegation suggesting that he played any role in relation to on-the-ground determinations about how to evaluate or respond to Michael's condition. Consequently, Count V will be dismissed without further discussion.

## DISCUSSION

The matter is before the Court on Motions to Dismiss filed by the District and Superintendent Smith (ECF Nos. 10 & 27) and by Jessica Daggett (ECF Nos. 13 & 28). For Plaintiffs to overcome these challenges, they must plead "a short and plain statement" of each claim that shows they are "entitled to relief." Fed. R. Civ. P. 8(a)(2). This requires "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausible "means something more than merely possible," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012), but is "not akin to a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

When applying this standard, the Court will accept all factual allegations as true and consider whether the facts, along with reasonable inferences that may arise from them, describe a plausible, as opposed to merely conceivable, claim. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011); *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010). The Court will not accept as true statements that are merely conclusory recitations of legal standards. *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014).

The Fourteenth Amendment's Due Process Clause provides that no State "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. In application, the Due Process Clause affords both procedural and

substantive rights, *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005), and § 1983 claims based on the Due Process Clause are commonly distinguished as either procedural due process claims or substantive due process claims.  In this case, Plaintiffs assert a substantive due process claim.

A substantive due process claim based on a state actor's performance of an executive (as opposed to legislative) task involves a very difficult burden of proof to establish liability.  The burden is so difficult because, "[i]n the realm of executive action, the Due Process Clause 'does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm,' nor does it 'guarantee due care' by government officials."  *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998)).  The Due Process Clause was not conceived to provide a federal alternative to state negligence and tort law.  *Id.*; *see also Lewis*, 523 U.S. at 848; *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  Consequently, "an abuse of power practiced by the executive branch of state government sinks to a level cognizable under the Due Process Clause only when it is so extreme and egregious as to shock the contemporary conscience."  *DePoutot*, 424 F.3d at 118.  Additionally, because such a claim raises significant concern over the "'need to preserve the constitutional proportions of constitutional claims,' the question of whether the challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized."  *Id.* (quoting *Lewis*, 523 U.S. at 847 n.8).

The following discussion begins with an analysis of Plaintiffs' municipal liability claim, including Plaintiffs' theory that the Senior Awareness Trip was so difficult and

poorly planned in relation to safety that it was inherently unconstitutional for the District to permit the participation of a student in poor physical condition.  From there, the discussion turns to the claim against Daggett, the one defendant who personally interacted with Michael on the day of his death and whose personal conduct is alleged to have contributed to his death.

## A.      The District – Municipal Liability

Plaintiffs' claim against the District is principally stated in Count I, but Plaintiffs also assert official capacity claims against Daggett (Count II) and Smith (Count IV).  An official capacity claim against a state actor is another means of asserting a claim against the actor's employer.  But in order to state a claim against Smith and Daggett's employer, the District, Plaintiffs must allege sufficient facts to support a plausible finding that Michael's constitutional rights were violated as a result of the District's own unconstitutional acts.  *Monell*, 436 U.S. at 690–91.  Consequently, Counts I, II, and IV are for practical purposes all the same claim, though each approaches the municipal liability question from a different perspective.

A municipal entity cannot be held liable for a constitutional harm inflicted by its employee absent a showing that the harmful conduct of the employee occurred as the result of a municipal policy or custom.  *Id.*  In this case, there is no plausible basis to find that the alleged choices made by Daggett that inform the deliberate indifference claim against her were dictated by any evident policy or custom of the District.  On that score, Plaintiffs' contrary contentions are entirely conclusory.  It is also apparent that there are no factual allegations that would support an inference that the District conferred upon Daggett the

authority to establish an on-the-spot policy or custom of deliberate indifference toward a student's serious medical need.  For these reasons, the official capacity claim against Daggett (Count II) can readily be dismissed.

What remains of the municipal claim are the claim against the District (Count I) and the official capacity claim against Smith (Count IV).  Because the two counts are for practical purposes the same, *Saldana-Sanchez v. Lopez-Gerena*, 256 F.3d 1, 4 (1st Cir. 2001); *Andino-Pastrana v. Municipio De San Juan*, 215 F.3d 179, 180 (1st Cir. 2000), and because the only policymaker evident from the allegations is Smith, for the remainder of this discussion I will refer to these two counts simply as the municipal liability claim.  As set out in the First Amended Complaint, the municipal liability claim incorporates the various subcategories of *Monell* liability.  Before reaching them and all their assorted standards and requirements, I reiterate that the overarching claim is a claim for deprivation of substantive due process, and therefore the overarching claim necessarily requires a showing that the District independently acted or failed to act in a conscience-shocking, deliberately indifferent fashion.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *Marrero-Rodríguez v. Mun. of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012); *Maldonado v. Fontanes*, 568 F.3d 263, 273–74 (1st Cir. 2009).[4]

---

[4] The "conscience-shocking" standard is indeed an "extremely demanding one, and challenges analyzed under it rarely succeed."  *González-Fuentes v. Molina*, 607 F.3d 864, 885 (1st Cir. 2010).  The First Circuit has explained:

> Executive acts that shock the conscience must be "truly outrageous, uncivilized, and intolerable," *Hasenfus v. LaJeunesse,* 175 F.3d 68, 72 (1st Cir. 1999), and "the requisite arbitrariness and caprice must be stunning." *Amsden v. Moran,* 904 F.2d 748, 754 n. 5 (1st Cir. 1990).  "[A] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so

### 1. *Policy or Custom*

"Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691). "Official municipal policy [or custom] includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61 (citing *Monell*, 436 U.S. at 691). To cause the harm, the policy or custom must be both the but-for cause and the proximate cause of the harm. *Cohen ex. rel. Cohen v. City of Portland*, No. 23-2026, 2024 WL 3616814, at *4 (1st Cir. Aug. 1, 2024).

Plaintiffs allege that an unconstitutional municipal custom or policy caused Michael's death. They contend, more specifically, that the District's adherence to a "boot camp" approach to planning and preparedness for a grueling hike provided an essential causal link between a municipal policy or custom and Michael's death. Pls.' Opp'n to District's Mot. at 2–4 (ECF No. 29). They augment that assertion with further contentions that the District "compelled" participation by students and stood "*in loco parentis*" to Michael. *Id.* at 3. They then itemize the many deficiencies set out in the pleadings related

---

disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *González–Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010).

*Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (third alteration in original). The depiction of such a level of depravity "is an indispensable element" of Plaintiffs' substantive due process claim. *DePoutot*, 424 F.3d at 118 n.4.

to the Senior Awareness Trip and Michael's involvement: *viz.*, Michael's poor fitness and the District's failure to screen participation based on fitness level; the chaperone's lack of training beyond CPR; the non-inclusion of parents in any pre-trip information session; and the District's failure to provide chaperones with satellite phones, portable AEDs, and thermometers, or to train chaperones in their uses. *Id.* at 4–5. Plaintiffs argue that these asserted attributes of the Senior Awareness Trip constitute a long-standing municipal policy or custom, and/or a failure to train, and that the deficiencies associated with the policy or custom satisfy the "state-created danger test." *Id.* at 5–6. In effect, they maintain that the combination of a serious physical challenge in a remote location, a deconditioned student, and chaperones inclined to motivate students to complete the hike but untrained to recognize the signs and symptoms of exertional heat stroke is a recipe for constitutional liability under the auspices of the Due Process Clause.

The District argues that the Plaintiffs' theories are wanting because all of the alleged shortcomings in the asserted policy or custom or failure to train involve, at worst, a lack of reasonable care that falls short of the substantive due process standard for liability to attach. District Mot. at 8–13; District Reply at 1–3 (ECF No. 32). The District also observes that there is no fact plausibly indicating that the alleged, on-the-ground acts or omissions by Daggett associated with compulsion or verbal pushing were dictated by a municipal policy or custom. District Mot. at 10, 12; District Reply at 2, 4.

The District's arguments are sound. Plaintiffs' allegations fail to depict and their arguments fail to illuminate independent acts or omissions by the District or its policy-making personnel that could fairly be determined to establish a policy or custom that

15

chaperones compel students to continue hiking despite an awareness that they are experiencing exertional heatstroke or another medical emergency.  It is, after all, an implausible inference to draw that the District condones or requires chaperones to behave in a deliberately indifferent fashion when they know a student is experiencing a medical emergency.  Furthermore, although precedent supports a municipal policy or custom claim when deliberate indifference is "persistent and widespread," *Baez v. Town of Brookline, Mass.*, 44 F.4th 79, 82 (1st Cir. 2022) (quoting *Connick*, 563 U.S. at 60–61), what is missing here are facts to suggest that the District ever disregarded unlawful conduct by chaperones in the past, let alone unlawful conduct that was persistent and widespread.  *See Off. of Pub. Guardian v. Elliot Hosp.*, 626 F.Supp. 3d 520, 531 (D.N.H. 2022) ("[E]stablishing the existence of a municipal custom requires more than proof that a particular course of action happened on one occasion." (citing *Miller v. Kennebec Cnty.*, 219 F.3d 8, 12 (1st Cir. 2000))).  Instead, what Plaintiffs allege is a longstanding approach to trip safety and emergency preparedness that runs a foreseeable risk that someone might experience serious harm.  The District's willingness to face that risk, however, is not a policy or custom of deliberate indifference toward either known, actual emergencies or likely constitutional violations by the District's chaperones.  *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 412 (1997).

Because a failure to observe the standard of reasonable care does not suffice for purposes of a substantive due process claim, *DePoutot*, 424 F.3d at 118, and because it cannot be said that Daggett's allegedly unconstitutional response to Michael's distress was

the product of a municipal policy or custom, Plaintiffs fail to state a viable policy or custom claim, *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60–61 (1st Cir. 2020).

### 2. Failure to Train

Under a failure-to-train theory, a "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (alteration in original) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Demonstrating deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his [or her] action." *Id.* (quoting *Brown*, 520 U.S. at 410). For the reasons outlined above, the allegations in this case do not plausibly establish a basis for municipal liability born out of an official policy of deliberate indifference toward a student's medical emergency or a policy dictating a forced march with inadequate water and rest with no opportunity to stop hiking and turn back. This case turns on poor decision-making during the hike. There is no doubt that some of the poor decision-making could have been avoided with training. But in the absence of a longstanding policy or custom "so likely to result in the violation of constitutional rights," *Farmer*, 511 U.S. at 841 (quoting *City of Canton*, 489 U.S. at 390), coupled with a conscious failure to act despite knowledge that the Senior Awareness Trip presented a "substantial risk of serious harm" to a deconditioned participant, *id.*, which is different from a foreseeable risk, the failure to train aspect of *Monell* is not independently actionable. *See Hill v. Walsh*, 884 F.3d 16, 24 (1st Cir. 2018) ("Here, there is no evidence of past violations, and what

happened to the Hills is not 'so obviously' the consequence of a systemic lack of training, as opposed to the decisions of individual officers.").

### 3. Decision of an Official with Final Authority to Establish Municipal Policy

"[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Brown*, 520 U.S. at 405. "Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.*

Plaintiffs' municipal liability claim fails to satisfy the final decisionmaker requirement. The allegations do not plausibly demonstrate that Daggett was an official with final authority to establish municipal policy or custom. And as for Smith, who perhaps was such an official, the allegations do not disclose any personal involvement in, let alone intent or direction concerning, the events of the day.

### 4. State-created Danger

Notwithstanding the foregoing impediments to the municipal liability claim, Plaintiffs argue that the state-created danger doctrine breathes life into their substantive due process claim. They argue that the claim is well stated because, essentially, Michael's heatstroke was foreseeable and the District did not take sufficient care to ensure that chaperones would guard against heatstroke, recognize heatstroke, or properly respond once a student experienced heatstroke. This is a different approach to the municipal liability claim because Plaintiffs now rely on the municipal policy or custom of sponsoring a

18

dangerous outing without ensuring that district chaperones are fully trained to meet all foreseeable medical emergencies.  *See* First Am. Compl. ¶¶ 198–99.  If Plaintiffs' are correct, then a school district's failure to guard against a foreseeable danger associated with a voluntary but challenging outing, coupled with a chaperone's poor performance in the field is all that is needed to generate municipal liability based on substantive due process. I am not persuaded that the state-created danger doctrine lowers the substantive due process standard to quite that extent.

"The Due Process Clause does not create an 'affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'"  *Cohen*, 2024 WL 3616814, at *2 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 196 (1989)). "However, a plaintiff may hold a state officer liable for 'failing to protect . . . from danger created or enhanced by [the officer's] affirmative acts.'" *Id.* (alteration in original) (quoting *Irish v. Fowler*, 979 F.3d 65, 67 (1st Cir. 2020)).

The state-created danger doctrine requires a plaintiff to establish:

(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;

(2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

(3) that the act or acts caused the plaintiff's harm; and

(4) that the state actor's conduct, when viewed in total, shocks the conscience.

*Johnson v. City of Biddeford*, 92 F.4th 367, 376 (1st Cir. 2024).  When evaluating the fourth requirement, courts must consider that, "[w]here officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger."  *Id.*  In contrast, "[w]here state actors must act in a matter of seconds or minutes, a higher level of culpability is required."  *Id.*

Plaintiffs' discussion of the state-created danger doctrine begins by focusing on the alleged actions of Daggett.  Pls.' Opp'n to District's Mot. at 5.  The Plaintiffs claim that Daggett "affirmatively acted to create and/or exacerbate the mortal threat Michael experienced."  *Id.*  From there, they seek to link Daggett's actions to the District by asserting that the District "developed and implemented chaperone selection policies which ensured that . . . Michael would be compelled . . . by Daggett" "to undertake the challenge of the Baldface ascent," *id.* at 6; and allege that the District knew that Daggett was a repeat chaperone over several years, First Am. Compl. ¶ 110, who would "push" students like Michael "to continue hiking despite . . . explicit pleas to stop and visible signs of . . . physical distress," *id.* ¶ 112.   They add that the danger was specific to Michael because he was "clinically obese and deconditioned."  Pls.' Opp'n to District Mot. at 6.  They also posit a state-created danger based on lack of training, stating that the District selected chaperones "untrained and unequipped to recognize or respond to evolving situations and medical emergencies."  *Id.* at 9.

Plaintiffs' arguments are thoughtful, but ultimately unconvincing.  Accepting as true Plaintiffs' factual allegations and the reasonable inferences that arise from them, a fact

finder would be able to conclude that the District has conceived a policy or custom of inviting students, regardless of individual physical condition, to participate in a very demanding hike despite poor chaperone preparedness for foreseeable medical emergencies. But a policy or custom of inviting student participation and failing to ensure fulsome preparation for foreseeable medical emergencies is not the same thing as acting with deliberate indifference to create or enhance a known, substantial risk of serious harm to a given student. *See Irish*, 979 F.3d at 74 ("To show deliberate indifference, the plaintiff 'must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk of serious harm . . . and disregarded that risk." (alteration in original) (quoting *Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004)). Benjamin Franklin's admonition that failing to prepare is preparing to fail is not a catchphrase for substantive due process liability. With or without the analytical overlay of the deliberate indifference standard and the enhancement-of-the-danger standard, a substantive due process claim requires conduct that is an order of magnitude worse than a lack of ordinary care or even an "unwise excess of zeal," such that a finder of fact could fairly infer that the District engaged in "a brutal and inhumane abuse of official power" "inspired by malice or sadism." *González–Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010). As dreadful as the facts and circumstances are, they do not rise to the level of a substantive due process violation. Plaintiffs' attempt to use the state-created danger rule to bridge the gaps in its municipal liability theories is unavailing.

**B.     Jessica Daggett – Personal Capacity**

Plaintiffs assert that Jessica Daggett deprived Michael of substantive rights protected by the Due Process Clause because her conduct toward him "enhanced the danger" he faced as a result of his participation in the Trip. Pls.' Opp'n to Daggett's Mot. at 3–5 (ECF No. 30). They also argue that Daggett's disregard for Michael's poor and worsening physical condition and his increasing physical struggle under difficult conditions demonstrate a conscience-shocking, deliberate indifference toward a threat of serious harm to Michael. *Id.* at 5–9.

Daggett argues that the Plaintiffs' allegations do not support an inference of unconstitutional conduct on her part because the conduct alleged does not shock the conscience or demonstrate deliberate indifference on her part toward a known, serious threat to Michael's health, or that she affirmatively acted to enhance the dangers inherent in the hike that Michael experienced. Daggett Mot. at 12–15; Daggett Reply at 1–2 (ECF No. 31). Daggett also argues that the doctrine of qualified immunity shields her from personal liability for Michael's suffering and death from exertional heatstroke. Daggett Mot. at 15–16; Daggett Reply at 4–6.[5] Because the qualified immunity doctrine raises the already high substantive due process standard even higher, I begin with it.

"When government officials are sued in their individual capacities for money damages, the doctrine of qualified immunity shields them from pecuniary liability unless

---

[5] Daggett also argues that Count II—the official capacity claim—is not actionable against her because her alleged conduct was not aligned with any municipal custom or policy. Daggett Mot. at 6–11. I addressed this claim in the preceding section since it is, in actuality, a claim against the District. *See Lewis v. Clarke*, 581 U.S. 155, 162 (2017); *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985); *Monell*, 436 U.S. ag 691 n.55.

their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lawless v. Town of Freetown*, 63 F.4th 61, 67 (1st Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The qualified immunity inquiry follows a two-part test: (1) whether the facts alleged by the plaintiff make out a violation of a constitutional or other federal right, and (2) whether the right was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. Courts "may address either prong of the qualified immunity analysis first," and "[a]n official may be entitled to qualified immunity 'based on either prong.'" *Ablordeppey v. Walsh*, 85 F.4th 27, 33 (1st Cir. 2023) (quoting *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022)). As for the second prong, "[a] plaintiff need not find an identical case concluding that a constitutional violation occurred," *Penate v. Sullivan*, 73 F.4th 10, 18 (1st Cir. 2023), but does have the burden to identify either controlling authority or a robust consensus of persuasive authority that would make it evident to any reasonable official in the defendant's position that her challenged conduct was illegal in the particular circumstances she faced. *Id.*

Before turning to the second prong related to clearly established law, which I conclude is determinative, I pause to reflect on the first prong, i.e., stating a claim for which relief may be granted. When it comes to a motion to dismiss for failure to state a claim the standard is not one of probabilistic outcomes. Rather, all plausible inferences must be drawn in favor of the Plaintiffs' assertions. Consequently, our natural tendency to presume that educators are well intentioned when they encourage students to push themselves cannot reflexively be relied on to reject Plaintiffs' personal capacity claim out of hand.

Nonetheless, precedent makes it clear that for liability to attach something dramatically more culpable than a lack of reasonable care is necessary. The finder of fact would be required to consider whether the facts alleged support an inference that Daggett's conduct toward Michael was more culpable than "careless or unwise excess of zeal," indeed, "a brutal and inhumane abuse of official power" "inspired by malice or sadism." *González–Fuentes*, 607 F.3d at 881. As the standard suggests, a closer consideration must occur based on the facts associated with Daggett's subjective mindset.

"'Deliberate indifference' is a state-of-mind requirement that goes beyond negligence." *Parlin v. Cumberland Cnty.*, 659 F. Supp. 2d 201, 208 (D. Me. 2009); *see Farmer*, 511 U.S. at 842; *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc). Claims of deliberate indifference to the serious medical needs of persons dependent on state protection[6] can shock the contemporary conscience, *Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 53 (1st Cir. 2006), and deliberate indifference can be demonstrated based on facts that fall short of proving an actual purpose to cause harm, *Farmer*, 511 U.S. at 835. A finding of deliberate indifference may be supported by a finding of recklessness in the face of a known, substantial risk of serious harm. *Id.* at 836–37. A deliberate indifference claim may also be informed by the "enhancement-of-danger prong of the state-created danger test," *Johnson*, 92 F.4th at 369 (citing *Irish*, 979 F.3d at 75), a multi-factor test of relatively recent vintage.

---

[6] The dependency of high school students on school personnel for care and safety is not absolute, unlike the dependency of prisoners on prison administrators. On the other hand, a student taken to a remote location with an inadequate personal supply of water, high exertional activity, no cell service to contact emergency personnel, or proper first-aid equipment, is in a different predicament than a student in a school setting.

The deliberate indifference and enhancement-of-the-danger standards lower the bar somewhat when it comes to satisfying the pleading standard associated with Federal Rules of Civil Procedure 8 and 12. Consequently, although I conclude that Plaintiffs' allegations do not support a plausible inference of malice under the enhancement-of-danger prong reflecting a reckless state of mind, the requirements of pleading conceivably have been watered down enough in this Circuit that another federal judge might conclude otherwise for purposes of pleading.[7] I therefore turn to the issue of whether Plaintiffs' allegations plausibly depict a knowing violation of clearly established law.

Daggett argues that it would not have been clear to every reasonable teacher in her position that her conduct toward Michael transgressed his constitutional rights and, consequently, she cannot be held personally liable under 42 U.S.C. § 1983. Daggett Mot. at 16. In my estimation, the state of the law today given the "enhancement-of-danger prong of the state-created danger test," *Johnson*, 92 F.4th at 369, has created sufficient ambiguity that federal judges—not to mention school officials untrained in the law—would have a hard time predicting what does or does not fall within the test's ambit for purposes of deciding who might be able to sue whom and for what under the Due Process Clause in the absence of a reasonably similar prior case. Although these ambiguities arguably work against Daggett when it comes to succeeding with her motion to dismiss for failure to state

---

[7] Whether the underlying factual allegations generate a plausible inference of liability in line with a complaint's conclusory legal allegations is a "context-specific" inquiry that sometimes "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679. Line drawing in these matters is not a function of metaphysical or moral certainty and I do not presume to have any more common sense than the next judge, for the most part. However, in my view the "need to preserve the constitutional proportions of constitutional claims" is apparent here. *DePoutot*, 424 F.3d at 118 (quoting *Lewis*, 523 U.S. at 847 n.8).

a claim, although I think not, they appear to cut the other way when it comes to qualified immunity.  The clearly established prong of the qualified immunity standard adds starch to Daggett's arguments for dismissal because the question becomes not what is merely plausible under a slightly watered-down legal standard, but what would have been clear to a reasonable official in Daggett's position who subjectively knew only those things that were known to Daggett.  When the analytical perspective is altered in that way, I conclude that dismissal of the personal liability claim against Daggett is warranted for two reasons.

First, the personal liability claim against Daggett relies on Daggett's alleged verbal pushing of Michael to continue hiking up the trail.  It also relies on the assertion that Michael was cowed into compliance by harsh language and the threat of discipline (although no actual threat is alleged).  First Am. Compl. ¶¶ 151–55.  These bases for liability do not sit well with circuit precedent at odds with the idea that high school students are dependent on teachers for their safety or are constitutionally harmed when offensive speech precedes, for example, emotional injury or another foreseeable harm.  *See Hasenfus v. LaJeunesse*, 175 F.3d 68, 71–72 (1st Cir. 1999) (suicide attempt); *cf. Doucette v. Jacobs*, 106 F.4th 156, 172 (1st Cir. 2024) (disabled elementary school child—seizures attributed to poor school programming).  A reasonable chaperone or teacher in Daggett's position could conclude that, standing alone, goading Michael to physically push himself on the trail, even by means of harsh language, would not offend the Constitution.  But this case is not dependent on allegations of goading standing alone, which leads to the second reason for applying qualified immunity.

Plaintiffs' case also relies on the assertion that the leaders of the Senior Awareness Trip, including Daggett, did not know the signs and symptoms of heatstroke.  First Am. Compl. ¶¶ 177, 195, 197.  For purposes of qualified immunity, this allegation works in Daggett's favor.  Qualified immunity "protects all state actors except 'the plainly incompetent and those who knowingly violate the law.'"  *Haley v. City of Bos.*, 657 F.3d 39, 47 (1st Cir. 2011) (alteration omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  If Daggett did not recognize the signs and symptoms of heatstroke, she could not have anticipated that the failure to honor Michael's request to turn back constituted deliberate indifference to a known, substantial risk of serious harm.  Moreover, even though it appears that Daggett had time to "make unhurried judgments," it is not apparent that she "perform[ed] multiple acts of indifference to a rising risk of acute and severe danger," given her lack of discernment as to the existence of a life-threatening condition. *Johnson*, 92 F.4th at 376 (quoting *Irish*, 979 F.3d at 75).  Nor, given that lack of discernment, would a reasonable school official in her position have recognized in her goading and other alleged shortcomings the deprivation of a clearly established right.

## C.     State Law Claims

Although they do not fall within this Court's original subject matter jurisdiction, the state law claims in this case are before the Court pursuant to 28 U.S.C. § 1367(a), the supplemental jurisdiction statute.  Ordinarily, a district court will dismiss supplemental state law claims when it dismisses all of the claims coming within is original subject matter jurisdiction.  *Artis v. District of Columbia*, 583 U.S. 71, 74 (2018).  Whether to retain or relinquish jurisdiction over supplemental state law claims depends on a variety of

considerations, including fairness, judicial economy, convenience, and comity. *Desjardins v. Willard*, 777 F.3d 43, 45 (1st Cir. 2015).  Here, the interests of fairness and comity favor the relinquishment of jurisdiction so the state law claims can be resolved in state court. Additionally, because the federal claims are being dismissed at the pleading stage, judicial economy and efficiency do not appreciably favor the retention of jurisdiction. Accordingly, I decline to exercise supplemental jurisdiction over the state law claims, which are dismissed pursuant to 28 U.S.C.A. § 1367(c)(3).

## CONCLUSION

For the reasons discussed above, Defendants Lake Region School District and Superintendent Alan Smith's Motion to Dismiss the First Amended Complaint (ECF No. 27) and Defendant Jessica Daggett's Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 28) are **GRANTED**.  The predecessor Motions that preceded the First Amended Complaint (ECF Nos. 10 & 13) are, likewise, **GRANTED**.

Counts I, II, III, IV, and V are DISMISSED FOR FAILURE TO STATE A CLAIM. Count III is also DISMISSED BASED ON QUALIFIED IMMUNITY.  Counts VI and VII are DISMISSED PURSUANT TO 28 U.S.C. § 1367(c)(3).

SO ORDERED.

Dated this 7th day of August, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge